15 F.3d 1258
 Delight F. SWINEFORD, Appellant,
v.
SNYDER COUNTY PENNSYLVANIA; Snyder County Board of
Commissioners; Guy Graybill, in his individual and official
capacities; Paul W. Woodling, in his individual and
official capacities; Lee Knepp, in his individual and
official capacities
 No. 92-7359.
 United States Court of Appeals,
Third Circuit.
 Argued Aug. 10, 1993.
Decided Feb. 4, 1994.
 
 James D. Crawford, (Argued), Schnader, Harrison, Segal & Lewis, Stefan Presser, American Civil Liberties Union, Philadelphia, Pennsylvania, for Appellant.
 Edward H. Feege, (Argued), Duane, Morris & Heckscher, Bethlehem, Pennsylvania, Matthew Chabal, III, Duane, Morris & Heckscher, Harrisburg, Pennsylvania, for Appellees.
 Before: SCIRICA, COWEN and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 SCIRICA, Circuit Judge.
 
 I.
 INTRODUCTION
 
 1
 In this action under 42 U.S.C. Sec. 1983 the plaintiff Delight F. Swineford, a former county voter registrar, claimed the defendants, Snyder County as well as members of the County's Board of Commissioners and its Chief Clerk, violated the First and Fourteenth Amendments and various state laws when they fired her in retaliation for publicly disclosing alleged electoral improprieties. After trial on the merits, the court entered judgment for defendants on all claims in accordance with the jury's special verdict findings and the court's extensive findings of fact. Swineford now appeals.
 
 
 2
 There are two issues on appeal. First, whether, on these facts, a Pennsylvania court would accord preclusive effect to a prior finding made by the Unemployment Compensation Review Board. Second, whether plaintiff's interest in free speech outweighed her employer's interest in providing efficient services. Under these circumstances, we do not believe the Pennsylvania courts would give preclusive effect to the Unemployment Compensation Review Board findings. Nor do we believe in this case that plaintiff's interest in free speech outweighed the defendants' interests in efficiency. We will affirm.
 
 II.
 FACTS
 
 3
 A. Early Conflicts at Work.
 
 
 4
 From January 1987 until November 1989, plaintiff Delight F. Swineford worked as a clerk in the Snyder County Commissioner's Office. Defendant Lee Knepp, the Chief Clerk, was her immediate superior. Swineford worked closely with Administrative Assistant Veda Heintzelman, Knepp, and the three-member Board of Commissioners in a small office.
 
 
 5
 Early in their relationship, personality conflicts developed between Swineford and Heintzelman, resulting in Swineford's making numerous complaints to the commissioners and Knepp over trivial office matters. In June 1988, Swineford requested and was denied a job reclassification and salary equal to that of Heintzelman, who had more experience and greater responsibilities. After the commissioners refused to promote her, Swineford began a detailed diary chronicling workplace events, including rumors about Heintzelman and the individual defendants.
 
 
 6
 In September 1988, Swineford attended a conference for county voter registrars sponsored by the Pennsylvania Department of State. After hearing the lectures and discussions, Swineford became convinced the Snyder County Election Bureau's procedures violated state law. For the next several months Swineford questioned Knepp about the propriety of various procedures and directions.
 
 
 7
 In October 1988, Swineford again asked the Snyder County Salary Board for a reclassification from the clerical to the administrative level. The Salary Board agreed to study Swineford's request but decided to delay a decision until the end of 1988. Swineford attributed this delay to Knepp's failure to support her. In December 1988, the Salary Board reclassified Swineford's clerical position to the technical category--one level below administrative level, one above clerical. Swineford complained to the Board of Commissioners, and after a lengthy meeting, the commissioners denied her requests.
 
 
 8
 B. Allegations of Misconduct.
 
 
 9
 Swineford created a 27-item list of Snyder County voter registration procedures which she contended violated Pennsylvania laws. Swineford first took the list to Commissioner Michael Aumiller--a Democrat and political adversary of defendant commissioners, Graybill and Woodling.[1] Aumiller edited the list and together with Swineford met with County Solicitor Jeffrey Wood to discuss what Swineford characterized as criminal activity within the courthouse. When Wood explained he would have to share anything they told him with the entire Board of Commissioners, Swineford refused to reveal her allegations. Wood advised Swineford that if her allegations were criminal in nature, there was a procedure she could follow to file a criminal complaint. Swineford did not follow this advice.
 
 
 10
 While the Board was still unaware of her allegations, Swineford contacted a Common Pleas Court judge at his home and requested a private meeting. At that meeting, Swineford presented the judge with her list of allegations. He advised her to seek legal counsel to determine the validity of her charges. Swineford ignored the judge's advice.
 
 
 11
 On April 25, 1989, Swineford presented her charges to the Commissioners. The Commissioners directed Wood to undertake a legal analysis of Swineford's charges and report back promptly. As part of his investigation, Wood repeatedly requested information from Swineford, but she failed to substantiate her claims. Swineford's refusal or inability to substantiate her charges hampered the investigation. At the completion of his extensive investigation, Wood concluded that Swineford's allegations were technical and minimal, and that the County had complied with state law. He reported that for many of Swineford's allegations, the Pennsylvania Election Code gave no specific instructions.[2]
 
 
 12
 On May 1, 1989, while the Commission's investigation was ongoing, Swineford contacted a reporter for a local paper and urged him to attend the Commissioners' meeting scheduled the next day. At that meeting, Swineford discussed her allegations in great detail. Her reported allegations became an instant local cause celebre.
 
 
 13
 At the conclusion of its investigation, the Commissioners found Swineford's allegations to be either (1) factually correct but not violations of state law; (2) simple restatements of the law; or (3) factually erroneous or unaccompanied by any proof. Based on the evidence presented and Solicitor Wood's advice, the Board concluded no illegal conduct had occurred. Commissioner Graybill wrote to Swineford telling her that compiling the list was proper, but her personal attacks against Knepp were not. The letter also warned Swineford to change her work attitude and improve relations with her co-workers. The Commission was split regarding what actions, if any, it should take regarding Knepp. Commissioner Woodling believed no action should be taken since no wrongdoing had been proved. Commissioner Aumiller wanted Knepp to receive a strong letter of reprimand unless he agreed to resign from the Republican State Committee. As a compromise, Commissioner Graybill drafted a letter commending Knepp for his service to the County, but instructing him to adhere more closely to state election regulations. All three commissioners approved the letter.
 
 
 14
 C. Swineford Takes Legal Action.
 
 
 15
 Dissatisfied with the results of the Commissioners' investigation, Swineford took her list to Snyder County District Attorney John Robinson. Without any further substantiation of her claims, Swineford requested that Robinson institute criminal proceedings against the defendants. Robinson told Swineford her allegations were de minimis, and that he would not assist her because her problems were personal in nature.
 
 
 16
 Robinson, however, forwarded Swineford's allegations to the Pennsylvania Attorney General, citing a lack of resources and a possible conflict of interest. In June 1989, after a full investigation, the Attorney General's Office concluded no criminal prosecution was warranted. Undaunted by the Attorney General's decision, Swineford again met with District Attorney Robinson. She also made another complaint to the Attorney General's Office which responded that Swineford's problems were a "personal matter between you and the two commissioners."
 
 
 17
 Swineford next contacted County Solicitor Wood and asked how, as a private citizen, she could file criminal charges. Upon learning Swineford intended to file a criminal complaint against them, Commissioners Graybill and Woodling decided to institute pre-termination proceedings believing her behavior was unsatisfactory and prejudicial to the efficient operation of the office. At a pre-termination hearing on July 11, 1989, the commissioners offered Swineford arbitration as an alternative to termination. Within days Swineford rejected the offer and threatened litigation. Citing the time and cost of litigation and the desire to return to normal productive office operations the commissioners voted on July 17, 1989, to terminate all pending personnel proceedings against Swineford.
 
 
 18
 Swineford refused to relent. After the County ceased all personnel actions against her, Swineford had a close friend contact the FBI in an effort to institute criminal proceedings against the defendants. The FBI took no action.
 
 
 19
 D. Problems Continue at Work.
 
 
 20
 Back at the office, Swineford repeatedly asked Knepp basic questions, writing down his answers as if to check them later for accuracy or consistency. As each criminal agency found her charges meritless, Swineford grew increasingly moody and uncooperative. Her work performance slipped. Office conditions became intolerable.
 
 
 21
 Even though Swineford had attempted to prosecute them, defendants and Swineford's co-workers went out of their way to accommodate her. They accorded her wide latitude and tolerated unnecessarily frequent work breaks and other liberties. Office efficiency fell.
 
 
 22
 In July, Swineford complained to the local ACLU office that the County had mistreated her. In response to the ACLU's inquiry, the commissioners met with Swineford and inquired as to specific instances of harassment. Swineford refused to respond until she consulted with counsel.
 
 
 23
 Swineford's behavior became increasingly unpredictable. In August, 1989, contrary to office policy and Knepp's direct instructions, Swineford opened materials sent by the County Solicitor's Office, examined them, and date-stamped each page. Swineford told Knepp she did it to prevent him from destroying any material before it went to the commissioners. By early September Swineford believed defendants and their agents were following her. She believed defendants had installed wiretaps and hidden cameras in a toilet, and in a paper towel dispenser. Although she often searched for cameras and wiretaps, she never discovered any.
 
 
 24
 On October 10, 1989, Commissioners Graybill and Woodling advised Swineford that her work was substandard. They told her she had neglected assignments by pursuing unassigned work and injecting herself in matters not her concern.
 
 
 25
 E. Termination.
 
 
 26
 When election officials opened the Chapman Township ballot box on election night, 1989, they discovered that none of the numeric designation stubs had been removed from the ballots.[3] Swineford, whose only job that evening was to perform clerical duties, immediately left her post and injected herself into the discussion over how to handle the ballots. Solicitor Wood decided the proper procedure would be to have the Judge of Elections along with the Majority and Minority Party Inspectors take the ballots to a separate room, tear off the attached numeric designation stubs, and return the box to the election officials responsible for counting the ballots. Common Pleas Judge Wayne Bromfield, who had ultimate authority over the matter, agreed. He ordered Wood to implement the procedure.
 
 
 27
 Swineford strenuously objected, insisting the entire precinct be disqualified. As officials tore the numeric stubs from the ballots, Swineford continued questioning Wood about Judge Bromfield's decision. Piqued, Swineford pushed past Wood, entered the room where the stubs were being removed, and attempted to close the door.[4] The next day at work, Swineford continued to criticize the handling of the Chapman Township ballots and questioned the Minority Commissioner and Wood about the decision. Even after receiving an explanation she continued to question and oppose Judge Bromfield's decision.
 
 
 28
 In response to Swineford's criticism, Judge Bromfield issued a Memorandum in which he explained what had occurred and why he had reached his result. In his Memorandum, Judge Bromfield noted Swineford's limited legal background and admonished her to "accept the limits of her authority and her knowledge."
 
 
 29
 The events surrounding election night were the straw that broke the camel's back. As a result of her conduct, Commissioners Graybill and Woodling reevaluated Swineford's job-performance. On November 28, 1989, at a regularly scheduled meeting of the Board of Commissioners, Graybill and Woodling voted to fire her.
 
 
 30
 F. Legal Proceedings.
 
 
 31
 Swineford filed for unemployment benefits under the Pennsylvania Unemployment Compensation Law. The County contested. After a brief hearing, at which the County was unrepresented by counsel, a referee found in favor of Swineford, saying:
 
 
 32
 [T]he record reflects no competent evidence that the claimant [Swineford] violated any of the employer's rules while carrying out the duties of her position. Further, there is no evidence that the claimant's actions were disruptive or detrimental to the operation or conduct of the employer's business.
 
 
 33
 The County appealed the referee's determination to the Unemployment Compensation Board of Review. The Board affirmed without taking further evidence.
 
 
 34
 On March 21, 1990, Swineford brought suit in district court claiming she was fired for raising allegations of voter registration improprieties. On April 11, 1991, the district court granted Swineford's motion for partial summary judgment on her First Amendment and related constitutional claims, ruling that the UCBR referee's findings precluded defendants from proving they would have discharged Swineford irrespective of her allegations.
 
 
 35
 On January 31, 1992, however, the district court vacated its grant of summary judgment, clearing the way for trial. After a 14-day trial the jury returned answers to 12 special verdict questions. Based on those answers, the parties originally agreed Swineford had failed to prove any of her claims, with the exception of the First Amendment claim. Defense counsel then requested an opportunity to submit briefs on the meaning of the jury's special verdict answers which the court treated as a motion for judgment.
 
 
 36
 After receiving cross motions for judgment on the verdict, the district court entered judgment for the defendants on all claims, including the claims under 42 U.S.C. Sec. 1983 and the First Amendment. Pursuant to Federal Rule 49, the court supplemented the jury's special verdict answers with 185 subsidiary findings of fact and nine findings on issues not submitted to the jury.[5] The court concluded that although Swineford's allegations may have addressed a matter of public concern, her speech was not protected because her interest in presenting the allegations to the District Attorney was outweighed by the County's interest as an employer in promoting the efficiency of its public services.
 
 
 37
 Swineford filed a timely appeal. We have jurisdiction under 28 U.S.C. Sec. 1291 (1988). Our review over issues of preclusion is plenary. See In re Graham, 973 F.2d 1089, 1093 (3d Cir.1992). In First Amendment cases the Constitution requires us to exercise independent appellate review of the record; thus we do not defer to the district court's factual findings. Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); Zold v. Mantua, 935 F.2d 633, 636 (3d Cir.1991). A jury verdict will not be overturned unless the record is critically deficient of that quantum of evidence from which a jury could have rationally reached its verdict. See Dutton v. Wolpoff and Abramson, 5 F.3d 649, 653 (3d Cir.1993); Powell v. J.T. Posey Co., 766 F.2d 131, 133-34 (3d Cir.1985).III.
 
 DISCUSSION
 A. ISSUE PRECLUSION
 
 38
 The district court granted Swineford's initial summary judgment motion on the grounds the UCBR referee's decision had preclusive effect in Swineford's civil rights suit. The court later vacated its ruling. Swineford claims the district court was correct the first time, and issue preclusion prevents the defendants from rebutting her allegation that defendants fired her because of her protected speech.[6]
 
 1. General Principles
 
 39
 Issue preclusion, also known as collateral estoppel, bars relitigation of issues adjudicated in a prior action. See Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1074 (3d Cir.1990). By contrast, claim preclusion, with which it is often confused, "gives dispositive effect to a prior judgment if the particular issue, albeit not litigated in the prior action, could have been raised." Id. at 1070.
 
 
 40
 Traditionally, the Supreme Court has favored application of common-law preclusion doctrines "to those determinations of administrative bodies that have attained finality." Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 111 S.Ct. 2166, 2169, 115 L.Ed.2d 96 (1991). As the Court stated:
 
 
 41
 "When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose."
 
 
 42
 Id. (quoting United States v. Utah Constr. & Mining Co., 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966)). The policy behind the rule is that "a losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on an issue identical in substance to the one he subsequently seeks to raise." Id.
 
 
 43
 Federal courts must give a state court judgment the same preclusive effect as would the courts of that state. See 28 U.S.C. Sec. 1738 (1988);[7] see also Migra v. Warren City School Dist. Bd. of Education, 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984) (teacher's state court action for breach of contract precluded subsequent federal court claim that the board's action breached her constitutional rights); McDonald v. West Branch, 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984) (declining to preclude Sec. 1983 action brought after unsuccessful arbitration); Kremer v. Chemical Constr. Corp., 456 U.S. 461, 485, 102 S.Ct. 1883, 1899, 72 L.Ed.2d 262 (1982) (federal court in Title VII case must give preclusive effect to state court decision upholding state agency's rejection of an employment discrimination claim as meritless when the state court's decision would be preclusive in state's own courts). See generally 3 Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law Sec. 19.38, at 662 (1992); Stephen B. Burbank, Interjurisdictional Preclusion, Full Faith & Credit and Federal Common Law: A General Approach, 71 Cornell L.Rev. 733 (1986).
 
 
 44
 Specifically, in University of Tennessee v. Elliott, the Supreme Court held that, when adjudicating Reconstruction Civil Rights laws, federal courts must give the same preclusive effect to state agency findings as would the state courts when the agency, acting in a judicial capacity, resolves disputed issues of fact. See 478 U.S. 788, 799, 106 S.Ct. 3220, 3226, 92 L.Ed.2d 635 (1986).[8] Thus, we must accord the referee's finding the same preclusive effect as would Pennsylvania courts. See Edmundson v. Kennett Square, 4 F.3d 186, 192 (3d Cir.1993).
 
 
 45
 2. Applying Issue Preclusion Under Pennsylvania Law.
 
 
 46
 For unreviewed state agency decisions, Pennsylvania courts apply issue preclusion when four conditions are met: first, the issue determined in the prior action is the same as that in a subsequent action; second, the party against whom the defense is invoked is identical to or in privity with the party in the first action; third, the previous judgment is final on the merits; fourth, the party had a full and fair opportunity to litigate on the merits.[9] Safeguard Mut. Ins. Co. v. Williams, 463 Pa. 567, 345 A.2d 664, 668 (Pa.1975). Only the first condition is relevant to this dispute.
 
 
 47
 In Pennsylvania, it is unsettled whether issue preclusion applies to findings made in an unemployment compensation hearing. Compare Frederick v. American Hardware Supply Co., 384 Pa.Super. 72, 557 A.2d 779 (1989) with Kelley v. TYK Refractories Co., 860 F.2d 1188 (3d Cir.1988) and Odgers v. Commonwealth Unemployment Compensation Bd. of Review, 514 Pa. 378, 525 A.2d 359 (1987); see also Louis B. Kushner and Alan C. Blanco, Collateral Estoppel Consequences of Unemployment Compensation Hearings in Wrongful Termination Hearings, 62 Pa.B.Ass'n Q. 37, 37 (1992) (conflicting authority "leaves unsettled the question of the issue preclus[ion] or collateral estoppel effect which should be accorded Unemployment Compensation Referee or Board of Review findings in subsequent litigation.").
 
 
 48
 In Kelley v. TYK Refractories Co., we held the Pennsylvania Supreme Court would not preclude a plaintiff from pursuing a Sec. 1981 race discrimination claim even though the UCBR had previously determined plaintiff voluntarily quit. There, a white corporate executive at a Japanese corporation alleged the company discriminated against him in violation of Sec. 1981. In the first action, the UCBR denied Kelley's unemployment claim, finding he was not discharged but instead quit voluntarily. 860 F.2d at 1191. In his subsequent federal action, defendants asserted the UCBR determination as a shield to preclude relitigating the nature of Kelley's job termination. We rejected defendants' preclusion arguments because "the issue of discharge before the board is [not] identical to the issue of discharge as presented in Kelley's Sec. 1981 claim." Id. at 1194.
 
 
 49
 Our ruling in Kelley was based on the Pennsylvania Supreme Court's decision in Odgers v. Commonwealth Unemployment Compensation Board of Review, 514 Pa. 378, 525 A.2d 359 (1987) that refused to give preclusive effect to an UCBR finding in a subsequent wrongful termination case. In the initial action the Commonwealth Court determined that the Philadelphia Federation of Teachers' work stoppage was a strike within the meaning of the Public Employee Relations Act ("PERA"). See Philadelphia Fed'n of Teachers v. Thomas, 62 Pa.Cmwlth. 286, 436 A.2d 1228 (1981). When individual teachers subsequently applied for unemployment compensation, the UCBR held the Commonwealth court's decision precluded the teachers from litigating the nature of their work stoppage under Pennsylvania's Unemployment Compensation Act. Odgers, 525 A.2d at 362. The Pennsylvania Supreme Court reversed, finding no issue preclusion because the issue before the lower court under PERA was not the same as that before the UCBR.
 
 
 50
 Under Odgers, reviewing courts must look beyond the superficial similarities between the two issues to the policies behind the two actions. 525 A.2d at 364. Only where the two actions promote similar policies will the two issues be identical for purposes of issue preclusion. Thus, issue preclusion could not apply because PERA primarily benefitted the public while the Unemployment Compensation Law principally benefitted private individuals. Id.[10]
 
 
 51
 Since Kelley, the Pennsylvania Supreme Court has not spoken on the preclusive effect of UCBR findings in subsequent litigation. Pennsylvania's intermediate appellate courts have issued somewhat contradictory rulings on the subject. In Frederick v. American Hardware Supply Co., 384 Pa.Super. 72, 557 A.2d 779 (1989), the Pennsylvania Superior Court held that an earlier decision of the UCBR denying plaintiffs compensation because of willful misconduct precluded plaintiffs from asserting they had been wrongfully discharged in a subsequent contract claim. Id. 557 A.2d at 781. At issue was whether discharged employees could assert their employer breached an implied employment contract by wrongfully discharging them. Without mentioning Odgers and without discussing whether similar policies and rights were implicated by the Unemployment Compensation Law and the good cause requirement for employee discharge under contract law, the court found the UCBR's prior determination that the employees engaged in willful misconduct was the equivalent of good cause permitting discharge in the subsequent contract suit. Id. 557 A.2d at 781.
 
 
 52
 The Commonwealth Court, by contrast, refused to give preclusive effect to a State Police Court Martial Board's ruling in a subsequent UCBR hearing. In Pennsylvania State Police v. Commonwealth Unemployment Compensation Board of Review, 135 Pa.Cmwlth. 71, 578 A.2d 1360 (1990), the Commonwealth Court found no issue preclusion because the issue at the court martial was different from that before the UCBR. Id. 578 A.2d at 1361 ("the issue in a willful misconduct case is not whether the employer had the right to discharge the employee for the conduct in question but whether the Commonwealth is justified in reinforcing that decision by denying benefits").
 
 
 53
 In this case, the issue before the UCBR was whether Swineford was ineligible for unemployment compensation benefits by reason of her willful misconduct. By contrast, the issue in this appeal is whether Swineford's firing violated her First Amendment right to speak out on a matter of public concern. As we noted in Kelley, the issue of discharge before the UCBR is not identical to the issue of discharge presented in a civil rights claim. 860 F.2d at 1194. Furthermore, "we do not think that an administrative agency consisting of lay persons has the expertise to issue binding pronouncements in the area of federal constitutional law." Edmundson, 4 F.3d at 193. Therefore, we believe that under these circumstances the Pennsylvania Supreme Court would not give preclusive effect to a UCBR finding in this subsequent civil rights action.[11]
 
 
 54
 Furthermore, sound policy supports this decision. The Unemployment Compensation Law is a depression-era statute. Its twin goals are to provide quick, basic compensation for workers who become unemployed through no fault of their own, and to protect the state treasury by shifting the cost of unemployment from the state welfare system to the employer pool. 43 P.S. Sec. 752; see also 76 Am.Jur.2d. Unemployment Compensation Sec. 2 & nn. 7-9 (1992).
 
 
 55
 Granting preclusive effect to UCBR findings here would undermine the policy of providing quick relief. Under the present system, the procedures to determine benefit eligibility are fast and informal. See, e.g., Pa.Unempl.Ins.Rep. (C.C.H.) p 4111 (if employers do not file appeal within 15 days of notification their right to appeal is waived); id. p 4115 (procedure need not follow common law or statutory rules of evidence); id. p 5636 (allowing telephone hearings under certain circumstances). Indeed, in this case, the hearing before the UCBR referee was relatively brief, and while this fact is not dispositive, the County was not represented by counsel.
 
 
 56
 So long as Board rulings are not preclusive, employers have little incentive to contest or appeal board findings. See Sewall v. Taylor, 672 F.Supp. 542, 544 (D.Me.1987) ("Defendant's potential liability in the state administrative proceeding is far less than it is in a suit for unlawful discharge pursuant to 42 U.S.C. Sec. 1983."). By contrast, "a broad rule of collateral estoppel might generate undue pressure to litigate to the utmost." Fleming James, Jr. & Geoffrey C. Hazard, Jr., Civil Procedure, Sec. 11.17, at 620 (3d ed. 1985). To the extent findings are preclusive, employers will litigate vigorously rather than risk compromising their defense in a subsequent suit where their potential liability is much greater. Applying issue preclusion would result, therefore, in protracted hearings and would slow the receipt of benefits.
 
 
 57
 The delay caused by granting preclusive effect to Board rulings would likewise frustrate the Act's policy of shifting the cost of unemployment from the state to the employer pool. See 43 P.S. Sec. 752. During the period when employers and workers engage in protracted litigation over benefit eligibility the state welfare system will have to bear additional costs in the form of increased welfare payments. See 76 Am.Jur.2d., Unemployment Compensation Sec. 2 n. 9 (1992). Thus, to the extent preclusion creates an incentive to litigate eligibility determinations, it runs counter to the stated policies of the Unemployment Compensation Law. Accordingly, we reaffirm our ruling in Kelley and hold Pennsylvania courts would not apply issue preclusion here because the policies underlying section 1983 and the Unemployment Compensation Law are sufficiently different.[12]
 
 B. FIRST AMENDMENT
 
 58
 Swineford alleges defendants fired her in retaliation for engaging in conduct protected by the First and Fourteenth Amendments of the Constitution. For most of this century public employers could condition employment without regard to First Amendment rights. See McAulife v. Mayor of New Bedford, 155 Mass. 216, 29 N.E. 517, 517 (1892) ("[A policeman] may have a Constitutional right to talk politics, but he has no Constitutional right to be a policeman.") followed in Adler v. Board of Educ., 342 U.S. 485, 492, 72 S.Ct. 380, 384, 96 L.Ed. 517 (1952). Today, it is well established public employers cannot condition public employment on a basis that infringes an employee's constitutionally protected interest in free expression. See Keyishian v. Board of Regents, 385 U.S. 589, 605-06, 87 S.Ct. 675, 684-85, 17 L.Ed.2d 629 (1967); Perry v. Sindermann, 08 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). The First Amendment, however, is not absolute. Within boundaries, the First Amendment allows a public employer to regulate its employees' speech in ways it could never regulate the general public's. See Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1735, 20 L.Ed.2d 811 (1968).
 
 
 59
 The test for analyzing retaliation against public employees was announced in Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). There, a public school teacher was fired for writing a letter to a local newspaper complaining about the allocation of school district funds. The Court held a public employee's interest in free speech must be balanced against the public employer's interest in providing efficient services. Because the letter involved a matter of public concern and neither impeded the teacher's work performance nor interfered with the operation of the school, the Court reasoned the teacher was acting as a member of the general public. Id. at 572-73, 88 S.Ct. at 1737. Therefore, the school district had no greater right to limit the teacher's speech than to limit the speech of any other member of the public. Id.
 
 
 60
 The Supreme Court revisited the issue of public employee speech rights in Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). In Connick, the plaintiff, a New Orleans Assistant District Attorney, was fired when, after a forced transfer, she circulated a questionnaire to other employees regarding the transfer policy. Id. at 140, 103 S.Ct. at 1686. Recognizing that "government offices could not function if every employment decision became a constitutional matter," id. at 143, 103 S.Ct. at 1688, the Court stated:
 
 
 61
 Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government; this does not require a grant of immunity for employee grievances not afforded by the First Amendment....
 
 
 62
 Id. at 147, 103 S.Ct. at 1690. Accordingly, the Court held the survey questions, with one exception, were not protected speech because they involved a personal grievance rather than a matter of public concern. Id. at 148, 103 S.Ct. at 1691.
 
 
 63
 Determining whether a public employee was fired because of her protected speech requires a three-step analysis. See Czurlanis v. Albanese, 721 F.2d 98, 103 (3d Cir.1983); Trotman v. Board of Trustees, 635 F.2d 216, 224 (3d Cir.1980) cert. denied, 451 U.S. 986, 101 S.Ct. 2320, 68 L.Ed.2d 844 (1981); Schneider v. Indian River Community College Found. Inc., 875 F.2d 1537, 1542 (11th Cir.1989). First, Swineford must show she was engaged in a protected activity. See Trotman, 635 F.2d at 224. If Swineford shows the activity was protected, she must then show the activity was a substantial or motivating factor in her discharge. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). Finally, if she meets these burdens, defendants have an opportunity to defeat her claim by demonstrating they would have taken the same action absent the protected conduct. Czurlanis, 721 F.2d at 103.
 
 
 64
 We do not reach the last two steps because we believe our decision on the first step is dispositive. Our inquiry on the first step requires balancing the public employee's interests in commenting on matters of public concern against the public employer's interests in efficiency. First, we must determine whether Swineford's speech was related to a matter of public concern. See Connick, 461 U.S. at 147, 103 S.Ct. at 1690 ("[W]hen a public employee speaks ... as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency...."). Only then will we determine whether the disruption caused by Swineford's speech was sufficient to justify her firing.
 
 1. Public Concern
 
 65
 The threshold issue is whether plaintiff's speech was a matter of public concern. As the Court noted in Connick:
 
 
 66
 When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the federal judiciary in the name of the First Amendment.
 
 
 67
 Connick, 461 U.S. at 146, 103 S.Ct. at 1689; see also Rankin v. McPherson, 483 U.S. 378, 384, 107 S.Ct. 2891, 2897, 97 L.Ed.2d 315 (1987); Pickering, 391 U.S. at 568. Determining whether speech is a matter of public concern involves an examination of the content, form, and context of a given statement as revealed by the whole record. Rankin, 483 U.S. at 385, 107 S.Ct. at 2897; see also Czurlanis, 721 F.2d at 103. The Court has employed various characterizations to depict what is meant by matters of "public concern." Compare Garrison v. Louisiana, 379 U.S. 64, 74-75, 85 S.Ct. 209, 215-16, 13 L.Ed.2d 125 (1964) (matters concerned with "the essence of self-government") with Pickering, 391 U.S. at 571-72, 88 S.Ct. at 1736-37 (matters as to which "free and open debate is vital to informed decisionmaking by the electorate") and Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 755, 105 S.Ct. 2939, 2943, 86 L.Ed.2d 593 (1985) (plurality opinion) (matters as to which " 'debate ... should be uninhibited, robust, and wide open' ") (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964)). Because of the nature of their employment, speech by public employees is deemed to be speech about public concern when it relates to their employment so long as it is not speech "upon matters of only personal interest." Czurlanis, 721 F.2d at 103 (quoting Connick, 461 U.S. at 147, 103 S.Ct. at 1690).
 
 
 68
 Under these formulations, the Court has found the following statements to be matters of public concern: following an assassination attempt on the President, a constable clerk's remark "if they go for him again, I hope they get him," Rankin, 483 U.S. at 384-87, 107 S.Ct. at 2897-99; a question by an assistant district attorney asking co-workers whether they "ever [felt] pressured to work in political campaigns," Connick, 461 U.S. at 149, 103 S.Ct. at 1691; legislative testimony by a state college teacher advocating a college be elevated to a four-year status, Perry, 408 U.S. at 595, 92 S.Ct. at 2696; a memorandum concerning teacher dress codes given to a radio station by a teacher, Mt. Healthy, 429 U.S. at 282, 97 S.Ct. at 573; complaints about school board policies and practices, Givhan v. Western Line Consol. School Dist., 439 U.S. 410, 413, 99 S.Ct. 693, 695, 58 L.Ed.2d 619 (1979); a public school teacher's letter to the editor criticizing the Board of Education's proposals for school financing, Pickering, 391 U.S. at 566, 88 S.Ct. at 1733. Compare Connick, 461 U.S. at 146, 103 S.Ct. at 1689 (survey questions concerning internal office grievances given to office staff not a matter of public concern).
 
 
 69
 This court has found public employee criticism of office internal operations a matter of public concern. See Zamboni v. Stamler, 847 F.2d 73, 77 (3d Cir.) (civil service employee's criticism of county prosecutor's reorganization and promotion plan) cert. denied, 488 U.S. 899, 109 S.Ct. 245, 102 L.Ed.2d 233 (1988); Rode v. Dellarciprete, 845 F.2d 1195, 1201 (3d Cir.1988) (state police civilian employee communication to reporter alleging speaker was harassed because of racial animus); Czurlanis, 721 F.2d at 104 (county auto mechanic's criticism of internal management of Department of Motor Vehicles); Trotman, 635 F.2d at 225 (professor's criticism of university president's efforts to increase faculty/student ratio); Monsanto v. Quinn, 674 F.2d 990, 996-97 (3d Cir.1982) (tax department employee's letters to tax commissioner expressing dissatisfaction with management of Tax Division). These cases indicate speech disclosing public officials' misfeasance is protected while speech intended to air personal grievances is not. Czurlanis, 721 F.2d at 103. Mindful of these considerations we turn to the content, form, and context of Swineford's speech.
 
 
 70
 Swineford alleged electoral malfeasance by publicly elected officials. As we stated in Czurlanis "[w]hether County officials ... were 'discharging [their] governmental responsibilities' " is speech "fall[ing] squarely within the core public speech delineated in Connick." Czurlanis, 721 F.2d at 104; see also O'Donnell v. Yanchulis, 875 F.2d 1059, 1061 (3d Cir.1989) (exposing breaches of the public trust is a matter of public concern). Here, as in Czurlanis, Swineford did not discuss the conditions of her personal employment, but instead the policies and practices of the office. Id. at 104.
 
 
 71
 Swineford initially took her complaints to defendants' political adversaries, but later went to the commissioners and to the press. By taking her complaints to the commissioners, the press, and finally several investigatory agencies, Swineford gave a public mien to her complaints. Her conduct is distinguishable from that in Connick, where the assistant district attorney only circulated her questionnaire to fellow staff members.
 
 
 72
 The district court found Swineford's crusade was motivated, at least in part, by personal animus and self-interest. The Supreme Court has stated self-interest and animus may indicate the speech involves a private dispute rather than an issue of public concern, see Connick, 461 U.S. at 148, 103 S.Ct. at 1691, but, as we pointed out in Rode, "complete reliance on [the speaker's] motivation for speaking is inappropriate." 845 F.2d at 1201; see also Versarge v. Clinton, 984 F.2d 1359, 1365 (3d Cir.1993) (motivation is only one factor to consider). Indeed, in Connick, the Court held that even though the Assistant District Attorney's questionnaire was motivated by self-interest and largely concerned personal grievances, one question concerning pressure to participate in political campaigns touched upon matters of public concern. 461 U.S. at 148-49, 103 S.Ct. at 1691. We credit the district court's findings that Swineford's actions were motivated in part by personal animus and self-interest. However, based on its content, form, and context, we believe Swineford's speech, at least in the early stages, touched on matters of public concern.
 
 2. Efficiency
 
 73
 Next, we address whether the County's interests in proper departmental management outweighed Swineford's interest in commenting on matters of public concern. Pickering, 391 U.S. at 568, 88 S.Ct. at 1734. As we have noted, we do not believe the UCBR findings should be given preclusive effect. Accordingly, we must review the entire record.
 
 
 74
 On one side, we weigh Swineford's interest in speaking and the public's interest in hearing. See Versarge, 984 F.2d at 1366; O'Donnell, 875 F.2d at 1061. On the other side, we weigh the public employer's interests. The employer's interests are impaired where the speech:
 
 
 75
 (1) "impair[ed] discipline by superiors"; (2) "impair[ed] ... harmony among co-workers"; (3) "ha[d] a detrimental impact on close working relationships for which personal loyalty and confidence are necessary"; (4) "impede[d] the performance of the speaker's duties"; or (5) "interfere[d] with the regular operation of the enterprise." ... These interests are referred to collectively as "disruption."
 
 
 76
 Versarge, 984 F.2d at 1366 (quoting Rankin, 483 U.S. at 388, 107 S.Ct. at 2899) (alterations in Versarge ); see also Rode, 845 F.2d at 1202 (courts must consider disruption in the workplace). Additionally, we inquire whether Swineford knowingly or recklessly made false statements and whether her speech was motivated by animus. See Czurlanis, 721 F.2d at 106.
 
 
 77
 a. Disturbance and Efficiency
 
 
 78
 The public has a significant interest in legitimate whistleblowing. See O'Donnell, 875 F.2d at 1062. Consequently, we have held that in cases involving speech on matters of public concern an employer must demonstrate the employee's conduct caused an actual disruption in order to outweigh the employee's interest in free expression. See Zamboni, 847 F.2d at 78. The presumption in favor of free speech is great, and a mere showing of a disruption is not, by itself, sufficient for a determination that an employee's speech is not protected. O'Donnell, 875 F.2d at 1062. However, the record before us provides ample evidence that Swineford's activities disrupted office efficiency beyond the point where she should be protected. Swineford was a clerical employee who worked closely with the Commissioners, Heintzelman, and Knepp in a small office. Proximity within an organizational hierarchy is a significant factor in the employer's demonstration that a public employee's speech had a detrimental impact on a necessarily close working relationship. See Rankin, 483 U.S. at 388, 107 S.Ct. at 2899; see also Czurlanis, 721 F.2d at 106 (noting the "crucial variant" in Pickering balancing is hierarchical proximity).
 
 
 79
 Swineford's investigation, her notetaking, and, above all, her dogged attempt to obtain criminal prosecutions destroyed any proper work relationship with Knepp, Heintzelman, and the Commissioners. Indeed, Swineford herself lamented her poor work relationship with fellow employees. As her investigation progressed, office conditions became intolerable and Swineford's performance slipped. Moreover, her intrusions into the decisional process of the Commissioners constituted conduct which could only have had an adverse effect on the discharge of their duties. Efficiency fell as co-workers tried to appease Swineford, and her superiors tolerated unnecessarily frequent breaks. We agree with the district court that Swineford's actions "adversely affected the discipline and morale of the office of the Commissioners ..., fostering disharmony ... and impair[ing] the efficiency of that office." Findings on Issues of Fact by The Court Which Were Not Submitted to the Jury # 6.
 
 
 80
 By itself, our belief that Swineford's conduct was disruptive cannot dispose of this case. Czurlanis, 721 F.2d at 107. We have stated "it would be absurd to hold that the First Amendment generally authorizes corrupt officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office." Id. (quoting Porter v. Califano, 592 F.2d 770, 773-74 (5th Cir.1979)). Here, however, the Commissioners and their counsel permitted Swineford, without any obstruction by them, to take her complaints to the various authorities for investigation. Swineford's relentless efforts to get criminal indictments against her superiors--despite the repeated rejection of her allegations by those charged with investigating those allegations--undermined not only workplace esprit de corps but her claim as well.
 
 
 81
 In a similar situation, the Court of Appeals for the Tenth Circuit held an employee's discharge for repeatedly voicing safety complaints did not violate the First Amendment where the allegations had been fully investigated and found to be untrue. Seibert v. Oklahoma ex rel. Okla. Health Sciences Ctr., 867 F.2d 591 (10th Cir.1989). The court stated:
 
 
 82
 Assuming plaintiff initially had a right to voice his concerns, it is undisputed that his supervisors looked into the complaints made to them and determined there were no safety problems. Paris [plaintiff's direct foreman] and two other supervisors, both engineers, spoke with plaintiff about his concerns. Unsatisfied with their explanation, he contacted the State Department of Labor who made an inspection of the HSC.... Nonetheless, even after this inspection, plaintiff continued to disagree about conditions and expressed this to other workers. His conduct created severe friction between himself and his foreman and caused disruption in other departments as well.
 
 
 83
 Id. at 596.
 
 
 84
 The same is true of Swineford. Swineford had an interest in publicizing alleged wrongdoing by public officials, and the public had an interest in hearing such allegations. But once her allegations were aired in the public, investigated and rejected by law enforcement agencies at various levels of government, Swineford's protective interest in free speech faded until it became solely a personal grievance as compared with the employer's continued obligation to effectively discharge its public duties. On balance, we believe the employer's interest in maintaining a functioning public office outweighed Swineford's interest in continuing what had become a personal grievance.[13]
 
 
 85
 b. False Statements
 
 
 86
 Another consideration is whether the remarks were false, and if so whether they were made knowingly or recklessly. See Pickering, 391 U.S. at 574, 88 S.Ct. at 1737. The Supreme Court has said:
 
 
 87
 [U]se of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social or political change is to be affected.
 
 
 88
 Garrison, 379 U.S. at 75, 85 S.Ct. at 216. We have indicated that plaintiff's interest in speech intended as retaliation against the employer is "accord[ed] little weight." Versarge, 984 F.2d at 1366. The record before us indicates Swineford intended to ensnare Knepp, and to have him and perhaps others indicted. Her continued failure to verify and substantiate her allegations is a strong indication of self-interest, not public spirit. This motivation reduces Swineford's right to protection from adverse employment action. Moreover, while there is no evidence Swineford knowingly made false statements, prolonged failure to authenticate allegations of criminal activity approaches reckless indifference to their veracity. Swineford refused to modify, edit, or narrow her allegations in any manner before presenting them to the District Attorney despite her presence at much of the Commissioner's investigation. Accordingly, we agree with the district court that "no reasonable person in Swineford's position would have taken those 31 allegations to the district attorney in an effort to have her superior, the Chief Clerk, and perhaps others indicted." Slip Op. at 33. By continuing her crusade after her allegations had been investigated by the press and the proper authorities, Swineford demonstrated she was concerned with her own interest, not the public's. The First Amendment will not shield her from reprisals brought on by her personal vendetta.[14]
 
 IV.
 CONCLUSION
 
 89
 Speech involving government impropriety occupies the highest rung of First Amendment protection. Moreover, the public's substantial interest in unearthing governmental improprieties requires courts to foster legitimate whistleblowing. However, the First Amendment does not convert private grievances into constitutional cases. Nor does it require public employers to sit idly by while disgruntled employees destroy office operations and efficiency. A balance must be struck between the employee's right to speak and the employer's need effectively to discharge its public responsibilities. On this record, after the plaintiff brought her grievances to the attention of the public and the proper law enforcement authorities who rejected them, her personal interest in continuing to seek a criminal indictment against the defendants was outweighed by the defendants' interest in efficiently meeting their obligations to the public.
 
 
 90
 For the foregoing reasons, we will affirm the judgment of the district court.
 
 
 
 [1]
 Swineford, like Graybill and Woodling, is a Republican
 
 
 [2]
 On the whole Swineford's allegations involved either very technical violations or no violations at all. Among the most serious of her allegations were: (1) Knepp failed to mail applicants a portion of the voter registration application but charged the state for postage at a rate that included the additional portion; (2) voter petitions were circulated without the candidate's name or the position sought filled in; and (3) absentee ballots were not properly mailed. Regarding these allegations, the record indicates (1) state investigators found no violation because any additional postage charge was minimal, (2) Swineford refused to substantiate the claim, and (3) the one time an absentee ballot was not received by mail, it was hand-delivered by an individual who held the voter's formal power of attorney
 Swineford's allegations are detailed in toto in the district court opinion. See Swineford v. Snyder County, No. 1: CV-90-0595, Slip Op. at 39-53 (M.D.Pa. Mar. 21, 1990).
 
 
 [3]
 Numeric designation stubs can be used to match a particular voter to a particular ballot
 
 
 [4]
 Wood wanted the door to remain open to prevent possible charges that the stubs had not been removed in accordance with Judge Bromfield's order
 
 
 [5]
 Rule 49 provides in part:
 If [when instructing the jury concerning issues raised by the special verdict questions] the court omits any issue of fact raised by the pleadings or by the evidence, each party waives the right to a trial by jury of the issue so omitted unless before the jury retires the party demands its submission to the jury. As to an issue omitted without such a demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.
 Fed.R.Civ.P. 49(a) (West 1993).
 
 
 [6]
 Specifically, Swineford asserts the referee's finding that "there is no evidence that [Swineford's] actions were disruptive or detrimental to the operation or conduct of the employer's business" is preclusive as to whether Swineford was fired because of her conduct at work
 
 
 [7]
 Section 1738 implements the Full Faith and Credit Clause, U.S. Const. art. IV, and says in relevant part:
 [The records and judicial proceedings of any court of any State, Territory or Possession] shall have the same full faith and credit in every court within the United States and its Territories or Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.
 28 U.S.C. Sec. 1738 (1988).
 
 
 [8]
 The Court's application of preclusive principles to unreviewed state agency proceedings has resulted in two distinct lines of cases. In one, the Court has denied such proceedings preclusive effect in subsequent ADEA claims, Astoria Federal, 501 U.S. at ----, 111 S.Ct. at 2171, and in subsequent Title VII claims, Elliott, 478 U.S. at 796, 106 S.Ct. at 3225; Roth v. Koppers Indus., Inc., 993 F.2d 1058, 1062-63 (3d Cir.1993). In the other, and relevant to our analysis here, the Court has held unreviewed state agency proceedings may be given preclusive effect in subsequent actions under Reconstruction-era civil rights statutes. Elliott, 478 U.S. at 797, 106 S.Ct. at 3225
 
 
 [9]
 For a full discussion of how judicially reviewed agency decisions are treated under Pennsylvania law, see Edmundson, 4 F.3d at 189-91
 
 
 [10]
 Plaintiff argues Kelley stands for the proposition that even if the statutes embody different policies, where the first adjudication made findings regarding the specific policies at issue in the second action, those findings are entitled to preclusive effect in a subsequent action. Appellant's Br. at 17 n. 1. We disagree
 Under Elliott, we must apply issue preclusion as would the Pennsylvania courts. In Odgers, the Commonwealth Court made an actual determination that the work stoppage constituted a strike. 525 A.2d at 362. Under the plaintiff's theory the Pennsylvania Supreme Court should have given the Commonwealth Court's ruling preclusive effect. It did not. Instead it looked to the public policies underlying the PERA and the Unemployment Compensation Law and found because the two laws were adopted to promote different policies there was insufficient identity between the issues raised to give preclusive effect. 525 A.2d at 363-64.
 
 
 [11]
 We note that our recent decision Edmundson did not involve the attempted use of offensive collateral estoppel, which the Supreme Court has held requires greater discretion on the part of a district court judge. See Parklane Hosiery Co. v. Shore, 439 U.S. 322, 331, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979)
 
 
 [12]
 Our conclusion is bolstered by the similar treatment given to findings of unemployment compensation boards in other states. See Board of Educ. v. Gray, 806 S.W.2d 400, 402-03 (Ky.Ct.App.1991) ("we simply do not believe that it would be equitable to allow the doctrine to be applied"); Shovelin v. Central N.M. Elec. Coop, 115 N.M. 293, 850 P.2d 996, 1004 (1993) (trial court did not err in refusing to give preclusive effect to Employment Security Department finding); Ferris v. Hawkins, 135 Ariz. 329, 660 P.2d 1256, 1259 (App.1983) (collateral estoppel cannot be asserted because action for unemployment compensation and action for reinstatement involve " 'distinct' legal rights"); Salida Sch. Dist., R-32-J v. Morrison, 732 P.2d 1160, 1164-65 (Colo.1987) (applying collateral estoppel to board findings "would be wholly inappropriate, and would frustrate the underlying purposes"); Storey v. Meijer, Inc., 431 Mich. 368, 429 N.W.2d 169 (1988) ("preclusive effect ... would be incompatible with this legislative policy"). California's unemployment compensation board findings are denied preclusive effect by statute. See Mahon v. Safeco Title Ins. Co., 199 Cal.App.3d 616, 245 Cal.Rptr. 103, 104 n. 1 (1988). See generally Committee on Benefits to Unemployed Persons, The Preclusive Effect of Unemployment Decisions in Subsequent Litigation, 4 Lab.Law. 69 (1988) (arguing against applying collateral estoppel)
 
 
 [13]
 Because we hold as a matter of law that Swineford's conduct was not protected, it is unnecessary to address the other two parts of the retaliatory discharge analysis. We note, however, that the jury's finding, that taking her list of allegations to the District Attorney was a substantial or motivating factor in Swineford's firing, cannot stand. It is unclear on the record before us whether the jury finding refers to the first time Swineford took her list to the District Attorney or the second; however, our decision would be the same in either case. Swineford took her allegations to the District Attorney twice, to the Attorney General twice, to the FBI, and to the ACLU, before finally asking the County Solicitor how she could bring charges as a private citizen. At least four months passed between her second trip to the District Attorney and her firing. During that time Swineford neglected work assignments, alienated co-workers, continuously challenged her superiors and publicly criticized a common pleas court judge
 Yet, despite Swineford's actions, defendants went out of their way attempting to repair the work relationship. Defendants allowed her unsatisfactory work performance and increasingly erratic behavior to go unaddressed for months until she publicly challenged a common pleas court judge on election night. Swineford's conduct between the time she approached the District Attorney and the time of her firing, coupled with the fact that defendants failed to take any action against Swineford for months, despite her continued attempts to have them indicted, convinces us a reasonable jury could not have found Swineford's firing was motivated by her taking the allegations to the District Attorney.
 
 
 [14]
 Plaintiff also claims the district court erred in ruling certain memoranda written by County Solicitor Wood were shielded by attorney-client privilege. We do not reach this issue. As noted, analysis of retaliatory discharge claims based on First Amendment protected activity involves a three-step test. Swineford bore both the burden of demonstrating she was engaged in a protected activity and the burden of demonstrating that engaging in the protected activity was a motivating factor in her firing before the defendants had the burden of showing they would have fired her regardless of the protected conduct
 Swineford claims Wood's trial testimony contradicted his previous statements indicating he had written memoranda to the defendants advising against firing Swineford because defendants' conduct was insupportable. The memoranda, therefore, go to the defendant's burden to show it would have fired Swineford anyway. Because we hold Swineford did not meet her initial burden of showing she was engaged in protected activity, the district court's ruling, if error, was harmless.