

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-25-2007

# Roberts v. Newark Pub Sch

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-5405

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Roberts v. Newark Pub Sch" (2007). *2007 Decisions.* Paper 1221.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1221

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No.  05-5405

_____

CLARENCE P. ROBERTS,

Appellant

v.

NEWARK PUBLIC SCHOOLS; ALAN ALVAREZ;
NEWARK TEACHERS UNION

_____

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 02-cv-00092)
District Judge: Honorable William H. Walls

_____

Submitted Under Third Circuit LAR 34.1(a)
March 8, 2007

Before: SLOVITER and AMBRO, Circuit Judges
POLLAK,[*] District Judge

(Opinion filed:  April 25, 2007)

_____

OPINION

_____

AMBRO, Circuit Judge

_____

[*]Honorable Louis H. Pollak, Senior United States District Judge for the Eastern
District of Pennsylvania, sitting by designation.

In this case Clarence Paul Roberts, a substitute teacher, sued the Newark Public Schools ("NPS"), Alan Alvarez (a Newark-area high school principal), and the Newark Teachers Union (the "Union") for their roles in allegedly "blackballing" him from teaching after he complained about not being paid for a snow day. Because the record evidence does not support his claims, we affirm the District Court's grant of summary judgment in favor of the defendants on all counts.

I.

Roberts began working as a substitute teacher for the NPS in 1991. He claims that until February 2000 he taught nearly every day. He had a dispute with school officials over his pay that month and alleges that he has been effectively "blackballed" from teaching ever since. The dispute stemmed from Roberts's assignment to teach at Barringer High School on January 25, 2000. He arrived ready to teach that morning; after he arrived, however, school was cancelled because of inclement weather. Roberts was not paid for the day, and he complained to school officials. After taking his complaint to the school, NPS administrators, and the Union, Roberts was paid. Shortly thereafter, Roberts claims that he stopped receiving teaching assignments.

In October 2002, Roberts sent a letter to NPS and to the Union complaining about his dearth of teaching assignments. Anne Grossi, a Union employee, investigated the matter by calling NPS to determine why Roberts was getting so few assignments. NPS personnel reported that he had limited himself to seven of 80 possible schools, all of

which were high schools that, according to Grossi, produce fewer and more competitive vacancies.

NPS maintains a registry of potential substitute teachers that includes the schools at which each teacher is willing to work. The registry also includes two lists from each school: a "preference list" and an "exclusion list." The preference list includes teachers that the school's principal finds particularly suitable, and the exclusion list is for teachers that the principal finds objectionable. When a position becomes available, the NPS program tries to place someone from the school's preference list; failing that, it moves to the general pool. The program will not place an individual on a school's exclusion list at that school. NPS has produced documentation showing that, of the seven schools at which Roberts will teach, he is on the preference list for one and the exclusion list for one.[1] Why he is on one exclusion list does not appear in the record.

Roberts filed suit in District Court against NPS, Alvarez (principal of Barringer High School), and the Union. He claims that NPS and Alvarez took adverse action against him in violation of the Constitution's First Amendment (as applied through the Fourteenth Amendment), the Equal Protection Clause of the Fourteenth Amendment, and their contractual duty of good faith and fair dealing. He further claims that NPS and Alvarez conspired to deprive him of his equal protection rights in violation of 28 U.S.C. § 1985(3) and that Alvarez tortiously interfered with an economic expectancy. Finally,

---

[1] He is on neither the preference nor the exclusion list for Barringer.

3

he alleges that the Union violated its statutory duty of fair representation by failing properly to pursue his complaint against NPS.

After full discovery, the District Court granted all three defendants summary judgment on all counts. For the reasons that follow, we affirm.[2]

## II.

Roberts claims that NPS and Alvarez violated his right to free speech by blackballing him from teaching after he complained about his pay. For NPS and Alvarez to be liable, Roberts's speech must have been on a matter of public concern:

> When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment. Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable.

*Connick v. Myers*, 461 U.S. 138, 146 (1982) (citations omitted). Thus, "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum [for relief]." *Id.* at 147.

---

[2] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367. We have jurisdiction under 28 U.S.C. § 1291. We review grants of summary judgment *de novo*, affirming only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Yurecka v. Zappala*, 472 F.3d 59, 62 (3d Cir. 2006); *see also* Fed. R. Civ. P. 56(c).

Here, Roberts's snow-day pay is not a matter of public concern. It does not involve a serious allegation of NPS "not discharging its governmental responsibilities," "actual or potential wrongdoing," or a "breach of the public trust." *See id.* at 148. Rather, it reflects Roberts's and Alvarez's (presumably good faith) disagreement over the NPS policy on snow-day pay, which the Union effectively resolved in Roberts's favor. This is not to say that a public employer's failure to pay its employees could *never* be a matter of public concern. As we have held, speech disclosing public officials' misfeasance is generally protected, *Swineford v. Snyder County*, 15 F.3d 1258, 1271 (3d Cir. 1994). But on this record, we see no evidence of the sort of widespread wrongdoing that would elevate this routine pay dispute to a federal cause of action. Without such evidence, we must conclude that Roberts spoke on a matter of private concern, and so his First Amendment claim is not actionable under *Connick*.[3]

### III.

Roberts also alleges that NPS's maintenance of preference and exclusion lists violates his right to equal protection. Because he does not claim to be a member of a protected class, he can only succeed by showing that the NPS's use of the lists is irrational. *See F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993) ("In

---

[3] As an alternative sustaining ground to this and all other claims against NPS and Alvarez, we note that there is nothing in this record to indicate that any adverse action has been taken against Roberts—because of his complaint or for any other reason. According to NPS's records, he is "on the list" for assignments at six of the seven schools at which he is willing to teach, including Barringer. As noted, he is on the exclusion list for one school, but there is nothing in the record to connect that exclusion to his complaint.

5

areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.").

We have little trouble discerning rational reasons for NPS's maintenance of the lists. It makes sense for principals to prefer to fill substitute teaching spots with a "short list" of people with whom they are familiar and have had postive past experiences. Similarly, it makes sense to allow principals to exclude teachers with whom they have had bad experiences. Thus, there is nothing irrational about NPS maintaining preference and exclusion lists for each school.

## IV.

Next up is whether NPS and Alvarez conspired to deprive Roberts of his right to equal protection and, if so, whether that this conspiracy is actionable under 42 U.S.C. § 1985(3). It is not. We held in *Farber v. City of Patterson*, 440 F.3d 131, 135 (3d Cir. 2006), that, to state a § 1985(3) claim, a plaintiff must allege discrimination against a "specific, identifiable class," not merely "a group of individuals who share a desire to engage in conduct that the . . . defendant disfavors." Here, Roberts has not so much as attempted to identify such a class. Therefore, his claim fails.

## V.

We continue with whether NPS and Alvarez's alleged blackballing breached the

6

implied covenant of good faith and fair dealing in his employment contract. The problem

is that Roberts did not have an employment contract. He was an at-will employee, and,

therefore, there was no covenant of good faith and fair dealing for his employer to

breach. *Varallo v. Hammond, Inc.*, 94 F.3d 842, 848 (3d Cir. 1996) (citing *McQuitty v.*

*Gen. Dynamics Corp.*, 499 A.2d 526, 529 (N.J. Super. Ct. App. Div. 1985)).

## VI.

Roberts argues that Alvarez tortiously interfered with his economic relationship

with NPS by blackballing him. Under New Jersey law, this cause of action only lies

"against defendants who are not parties to the relationship." *Printing Mart v. Sharp*

*Elecs. Corp.*, 563 A.2d 31, 37 (N.J. 1989). A threshold question, then, is whether

Alvarez, as an NPS school principal with authority to determine who was eligible to

teach as a substitute at his school, was a party to Roberts's and NPS's relationship.

The New Jersey Supreme Court has not yet addressed this question. In *F.D.I.C. v.*

*Bathgate*, 27 F.3d 850, 875–76 (3d Cir. 1994), we, however, predicted that the New

Jersey Supreme Court would not allow a tortious interference claim against a co-

employee exercising privileges of his employer. Here, because Roberts is an at-will

employee, NPS has broad latitude to decline to offer him additional jobs. In excluding

Roberts, Alvarez was exercising NPS's privilege not to hire Roberts, as NPS has

empowered Alvarez to do. Thus, under our precedent,[4] Alvarez's alleged actions cannot

---

[4] We note that our prediction of New Jersey law follows from a black-letter principle of agency law: "An agent is privileged to do what otherwise would constitute a tort if his

give rise to a tortious interference claim.

## VII.

Roberts's final claim is against the Union; he alleges it breached its duty of fair representation by not filing a formal grievance on his behalf when he complained about his dearth of teaching assignments. A union only breaches its statutory duty of fair representation when its conduct is "'arbitrary, discriminatory, or in bad faith.'" *Hendricks v. Edgewater Steel Co.*, 898 F.2d 385, 388 (3d Cir. 1990) (quoting *Vaca v. Sipes*, 386 U.S. 171, 190 (1967)).

Roberts maintains merely that the Union failed to file a grievance when he complained. In response, the Union has produced evidence that its personnel interviewed Roberts about his claim, investigated the claim by speaking with NPS personnel, and determined that the small number of assignments was caused not by any adverse action against Roberts but by his own choice to limit his availability to only seven competitive schools. There is no record evidence showing that the Union's handling of Roberts's complaint was anything but competent. Thus, his fair representation claim fails.

\* \* \* \* \*

In this context, we hold that the District Court properly granted summary judgment in favor of NPS, Alvarez, and the Union on all counts.

---

principal is privileged to have an agent do it and has authorized the agent to do it." Restatement (Second) of Agency § 345 (1958). Here, it is undisputed that Alvaraez, as an NPS principal, was authorized to exclude otherwise eligible substitute teachers from his school.

8