**Donald McHUGH, Plaintiff,**

v.

**The BOARD OF EDUCATION OF THE MILFORD SCHOOL DISTRICT, Robert D. Smith, Charles S. Postles, Jr., Defendants.**

**No. Civ.A. 98–581 MMS.**

United States District Court, D. Delaware.

June 5, 2000.

Neil R. Lapinski, Wilmington, DE, for plaintiff.

Ellen Marie Cooper, Morris, James, Hitchens & Williams LLP, Wilmington, DE, for defendants.

## *OPINION*

SCHWARTZ, Senior District Judge.

Plaintiff Donald McHugh ("McHugh") was employed as the Supervisor of Transportation/Visiting Teacher by the Board of Education of the Milford School District ("School Board" or "Board") from July 1, 1994, until June 30, 1999. On July 13, 1998, the Board voted to reorganize the School District's administrative structure and eliminated McHugh's position. On August 12, 1998, the Superintendent of Schools, Dr. Robert D. Smith ("Smith"), informed McHugh of the reorganization and that his contract would not be renewed after it expired on June 30, 1999. McHugh brought this action, pursuant to 42 U.S.C. § 1983, against the Board, Smith, and Board member Charles S. Postles, Jr. (collectively "defendants"),[1] alleging that the decision to eliminate his position and not renew his contract was made in retaliation for various statements he had made criticizing certain bus drivers regarding safety and contract awards in the Milford School District in violation of his First and Fourteenth Amendment rights and in violation of various state laws. The defendants have moved for summary judgment on all counts. For the reasons stated herein, their motion will be granted in part and denied in part.

### I. Factual Background

As the Supervisor of Transportation of the Milford School District, McHugh was responsible for administering the School District's bus transportation, which was provided by either buses owned by the School District or buses owned by private contractors. In addition to his administrative duties, McHugh was also primarily responsible for investigating any complaints regarding the private bus contractors, reporting the results of his investigations to the School District's Director of Operations. During the course of his tenure as Supervisor of Transportation, McHugh investigated several complaints involving the Bowman Bus Service and its owners, James A. and William P. Bowman. The gravamen of McHugh's complaint is that the Board eliminated his position and did not renew his employment contract in retaliation for statements he made regarding the Bowmans and their bus company.

### A. Bowman Complaints

An incident involving the Bowmans occurred towards the end of March, 1995.[2] McHugh submitted several memoranda to the then-Superintendent, Charles Moses, and former Assistant Superintendent, Daniel McGinniss, regarding a "Reckless Driving Incident" in which William Bowman apparently steered a moving bus in the direction of a School District employee. *See* A–83, B–11, B–16. Following his investigation, in April, 1995, Charles Moses asked McHugh to speak before the Board about the incident. At the meeting, McHugh "did little more than introduce himself and the topic for discussion before being interrupted ... and asked to leave...." B–124 (Affidavit of Daniel McGinniss).

---

1. McHugh's complaint initially named Bowman Bus Service, Inc., James A. Bowman, and William P. Bowman as defendants in this case. The claims against those defendants were dismissed pursuant to stipulation on March 2, 2000.

2. The record also contains evidence of various prior complaints against the Bowmans, dating back to 1986. *See, e.g.,* A–99; B–19 (summary of complaints against William Bowman). However, in Plaintiff's Answers to Defendant Board of Education of Milford School District's First Set of Interrogatories, the March 1995 incident is the earliest incident referenced by McHugh as the basis for his assertedly protected statements about matters of public interest. *See* B–87–125.

References to A–___ are citations to the appendix to defendants' brief in support of their motion for summary judgment. Docket Item ("D.I.") 43. References to B–___ are citations to the appendix to McHugh's answering brief. D.I. 45. References to C–___ are citations to the appendix to defendants' reply brief. D.I. 47.

In the summer of 1996, Defendant Robert Smith was hired as the Superintendent of the Milford School District. That Fall, McHugh met with Smith to discuss overcrowding problems on the buses run by private contractors, including the Bowman Bus Service. Later that Fall, McHugh, Smith, James Bowman, Charles Postles (School Board member and named defendant here), and Larry Warner (a bus contractor) attended a meeting held to discuss the overcrowding problem and McHugh's proposed solution. During the meeting, Postles "raised his voice, acted belligerent [sic] toward Mr. McHugh, made demands of Mr. McHugh, and asked repeated questions regarding the operation of the transportation department." B–117–118 (Affidavit of Larry Warner). Nevertheless, as a result of the meeting, the parties were able to ameliorate the overcrowding problem. See B–33 (Memorandum by Robert Smith). Following the official meeting, McHugh met with Smith and expressed his dissatisfaction with the Bowmans. See id. Smith responded that, "without clear facts and evidence of wrongdoing, [he] was not interested in pursuing [action against them]." Id. In addition, Smith indicated that he was most interested in passing a reform referendum for the School District and "needed everyone, including the Bowmans, to pass [it]." Id.

The next event in the Bowman saga occurred in March, 1997. At that time, McHugh investigated a complaint by a student who alleged that William Bowman struck her while she was on one of his buses. See A–100, A–101. The investigation was inconclusive.

Approximately two months later, on May 28, 1997, McHugh investigated a complaint alleging that William Bowman stopped his bus abruptly in order to discipline a student, causing her injury. See A–118. As a result of the investigation,

Bowman received a verbal reprimand from Smith and also agreed to reimburse the injured student's parents for her medical expenses.[3] See A–125, A–317. McHugh apparently was unhappy with the pace of the School District's response to this incident, see B–89, and he recommended that William Bowman no longer be permitted to transport District students. See A–121.

As a result of the alleged delay by Smith and Postles, who was the president of the School Board, in responding to McHugh's complaint about William Bowman, McHugh brought charges of official misconduct against them before the Board. See A–128, A–133. McHugh asserts that, when he told Smith about his desire to bring charges against him and Postles, Smith indicated that McHugh would be fired as a result. See A–127 (handwritten note by McHugh). The Board (without Postles) responded by hiring David H. Williams, Esquire, to act as an independent fact-finder to determine whether there was probable cause for the Board to act on McHugh's charges. See A–136, A–303. On January 5, 1998, Williams wrote to McHugh requesting additional documentation to support the charges contained in his memorandum to the Board. See A–134. McHugh provided no additional evidence, and Williams ultimately concluded that there was no probable cause for the Board to proceed against Smith or Postles. See A–137.

In February, 1998, McHugh investigated yet another complaint against William Bowman, involving charges that Bowman had distributed dog biscuits to children on another contractor's bus. See A–159–190. As a result of the investigation, Smith issued a written reprimand to Bowman and suspended his bus driving privileges for 30 days. See A–316, B–38.

Finally, in June, 1998, McHugh began investigating the distribution of bus routes

---

3. In late September, 1997, McHugh received and shared with Smith a message from the student's mother indicating that her medical bills had not been paid. As a result, Smith contacted the mother and James Bowman, and the student's medical expenses were paid on or before October 2, 1997. See A–316.

prior to McHugh's tenure as Supervisor of Transportation. *See* A–191, B–42. In essence, McHugh was charging that the Bowman Bus Company had received preferential treatment in route assignments during the period 1991–1993. *See* A–317. After receiving notice of McHugh's investigation, Smith sent an e-mail to Daniel McGinniss, the assistant superintendent, in which he stated: "I would also think that given the time frame, the Bowmans may have some property right in the disputed route. If a mistake was made, it would appear that the district, not the Bowmans were [sic] responsible for the mistake. If we go back now and take the route back from the Bowmans, we could be creating a legal challenge that we could not defend." B–45. Ultimately, the results of McHugh's investigation were forwarded to the District Attorney, James Griffin, who advised the Board that the information "was not conclusive of any wrongdoing on the part of the District and that the statute of limitations had tolled on any claim for breach of contract that the [other] contractors could make." *Id.* McHugh was informed of this result.

### B. Reorganization Plan

Although the reorganization plan that eliminated McHugh's position was not adopted until the summer of 1998, in the summer of 1996, the Board directed Smith, newly hired as Superintendent, to develop a plan to reorganize the School District's administrative staff by creating and/or eliminating positions in an effort to increase efficiency. *See* A–228. Indeed, Smith first proposed his reorganization plan—which specifically included the elimination of McHugh's position or that of the Supervisor of Buildings and Grounds and the creation of a Director of Personnel—at the December 17, 1996, Board meeting. *See* A–302–303. As a result of his proposal, the Board extended McHugh's contract for only two years, as opposed to the

three-year extension usually granted to administrative employees. *See id.; see also* A–93.[4]

On July 13, 1998, Smith presented his reorganization plan to the Board. According to Smith, he recommended that McHugh's position as Supervisor of Transportation/Visiting Teacher be eliminated for four reasons: (1) the position was really a combination of two half-time positions, and the State only funded 56% of the salary for the Supervisor of Transportation position and 94% of the salary for the Visiting Teacher position, *see* A–64, A–311–312; (2) the Assistant Superintendent of Operations was already making early-closing decisions, reviewing bus contracts, handling bus discipline, and supervising the Supervisor of Transportation, *see* A–253; (3) by eliminating McHugh's combined position, the District could hire a full-time licensed clinical social worker in the position of Visiting Teacher at no cost to the District, *see* A–304, A–312; and (4) because the Board intended to make $25,-000,000 in capital improvements, it was necessary to maintain the position of Supervisor of Buildings and Grounds in the organizational structure, *see* A–304.

In an effort to demonstrate that the Board's reorganization plan was essentially a sham, McHugh has submitted several affidavits that he asserts show the Board has not implemented the plan. First, Ann Granger, who is an aide on the special-education bus, avers that she saw the following on a chalk-board in the conference room at the Milford School District's main office: "Visiting Teacher–Gus" and "Transportation–Construction—Wes." B–119. She also avers that she has since learned that Gus is Mr. Gus Walker. In addition, Alice Van Scoy, who is a driver on the special-education bus, avers that she saw the same writing on the chalk board. *See* B–121. Third, William P. Jester, also a driver on the special-education bus, avers that he saw Mr. Gus Walker

---

**4.** The Board extended the contract of the Supervisor of Building and Grounds for only two (as opposed to three) years as well. *See id.*

driving the gray Chevrolet Corsica once driven by McHugh. *See* B–125. Finally, Mr. Steve Peterman, a bus contractor for the School District, avers that Wes Stack, the Director of Operations for the School District, was apparently also filling in as transportation supervisor and supervisor of buildings and grounds. *See* B–129. Peterman further avers that Mr. Stack "implied that the two jobs together are too much for one office" and that "he wouldn't be surprised" if the two jobs were separated in the future. B–129–130.

Defendants respond with affidavits of their own. Smith's affidavit explains:

[Gus Walker] is currently performing some urgent visiting teacher duties that cannot be prolonged while we wait for a full time visiting teacher.... Due to an impending legislative delay of the state's new requirements for summer school, Mr. Walker has some time available to handle these extra duties on an interim basis. Milford School District fully intends to hire a full time social worker/visiting teacher, hopefully in the near future. The district does not wish to enter into contract with someone and commit that unit funding until this case is resolved. When a person is hired, the district will seek a Master Degree Social Worker or Licensed Clinical Social Worker for this position that so that the local portion of the salary can be charged to Medicaid and/or Medicare....

Concerning Dr. Wes Stack's position as "Interim Director of Operations and Transportation," the district hired Mr. Ed Seibert as the Director of Operations for the 1999–2000 school year. Mr. Seibert started the school year and served in that position through October 31, 1999 when he left to take a position with the Delaware Department of Instruction.

Dr. Stack was made the Interim Director of Operations and Transportation shortly after Mr. Seibert's departure.... [O]n December 20, 1999 ... Dr. Stack was given a two-year contract as Director of Operations.... The district does not plan to reestablish a separate Supervisor of Transportation position for the foreseeable future.

C–82–83; *see also* C–86 (affidavit of Wesner Stack) ("I did not say [to Mr. Peterman] that the position I occupy was going to be split into two positions in the near or distant future.... The reason for my title, Interim Director of Operations, is that Dr. Smith asked me to serve on an interim basis, given the sudden resignation of my predecessor, until such time as the Milford School Board would have the opportunity to offer me a contract as Director of Operations.").

\* \* \* \* \* \*

On October 9, 1998, McHugh filed this civil rights action, pursuant to 42 U.S.C. § 1983, against the Board and against Smith and Postles in their individual capacities. McHugh alleges that defendants' decision not to renew his contract was made in retaliation for his statements regarding matters of public concern in violation of his First Amendment rights. He also alleges the decision not to renew his contract deprived him of a liberty interest protected by the Fourteenth Amendment. Finally, McHugh asserts state-law claims for breach of the implied covenant of good faith and fair dealing, intentional interference with a contractual relationship, discrimination with respect to the terms of McHugh's employment due to his reporting of suspected violations of State laws and regulations, and a claim for wrongful discharge.[5]

---

**5.** Following oral argument, McHugh moved to supplement the briefing on the First Amendment retaliation claim and on the issue of the Board's immunity. On April 11, 2000, the Court denied the motion with respect to the First Amendment issue, but it granted the motion with respect to the narrow issue of the standard of liability for the Board, as opposed to that for the individual members of the Board. *See* D.I. 56. The supplemental briefing was completed on April 25, 2000.

## II. Jurisdiction and Standard of Review

The Court has jurisdiction over McHugh's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and has jurisdiction over McHugh's related state claims pursuant to 28 U.S.C. § 1367(a). The standard for summary judgment is a familiar one; summary judgment is appropriate where "there is no genuine issue as to any material fact and [ ] the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "When the nonmoving party bears the burden of persuasion at trial, the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry that burden." *Bray v. Marriott Hotels*, 110 F.3d 986, 989 (3d Cir.1997). If the moving party makes such a showing, the burden shifts to the nonmoving party, who must present evidence through affidavits, depositions, or admissions on file to show that there is a genuine of material fact. *See Celotex Corp. v.. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party meets its burden if it "provides sufficient evidence to allow a reasonable jury to find for him or her at trial.... In reviewing the record, the court must give the nonmoving party the benefit of all reasonable inferences." *Bray*, 110 F.3d at 989.

## III. Discussion

### A. Immunity

The defendants asserted in their briefs that the School Board, Smith, and Postles were all absolutely immune from liability under § 1983 pursuant to the Supreme Court's recent decision in *Bogan v. Scott–Harris*, 523 U.S. 44, 54, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998), which held that "[l]ocal legislators are entitled to absolute immunity from § 1983 liability for their legislative activities." At oral argument, defendants conceded that, at best, *Bogan* supports immunity only for Smith and Postles, and therefore, they abandoned their claim that

the Board itself has any immunity defense. *See* D.I. 55 (Transcript of March 2, 2000), at 6, lines 9–11. Accordingly, the Court will limit its immunity discussion to the individual defendants.

In *Bogan*, the plaintiff alleged her discharge, which was effected by an ordinance eliminating the city's Department of Health and Human Services (of which she was the sole employee), was motivated by racial animus and was in retaliation for filing a complaint against another employee who had made racial and ethnic slurs. She sued the mayor and vice president of the city council under § 1983, but the Supreme Court held that the ordinance "bore all the hallmarks of traditional legislation" and, therefore, that the individual, local legislators were entitled to absolute immunity. *Bogan*, 523 U.S. at 55, 118 S.Ct. 966. In so holding, the Court rejected McHugh's argument made in this case that the defendants' actions were not legislative because they were specifically targeted at an individual. The Court reasoned:

> Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it.... This leaves us with the question of whether, stripped of all considerations of intent and motive, petitioners' actions were legislative. We have little trouble concluding that they were. Most evidently, petitioner Roderick's acts of voting for an ordinance were, in form, quintessentially legislative. Petitioner Bogan's introduction of a budget and signing into law an ordinance also were formally legislative, even though he was an executive official. We have recognized that officials outside the legislative branch are entitled to legislative immunity when they perform legislative functions[;] ... Bogan's actions were legislative because they were integral steps in the legislative process....

*Id.* at 55, 112 S.Ct. 1021 (internal citations omitted). As for the substance of the ordinance, the Court said:

We need not determine whether the formally legislative character of petitioners' actions is alone sufficient to entitle petitioners to legislative immunity, because here the ordinance, in substance, bore all the hallmarks of traditional legislation.[6] The ordinance reflected a discretionary, policymaking decision implicating the budgetary priorities of the city and the services the city provides to its constituents. Moreover, it involved the termination of a position, which, unlike the hiring or firing of a particular employee, may have prospective implications that reach well beyond the particular occupant of the office. . . .

*Id.* at 55–56, 112 S.Ct. 1021; *see also Larsen v. Senate of the Commonwealth,* 152 F.3d 240, 249 (3d Cir.1998) (recognizing Supreme Court's adoption of "a functional approach to immunity issues so that 'whether an act is legislative turns on the nature of the act,' *Bogan,* [523 U.S. at 54, 118 S.Ct. at 966], rather than the nature of the actor's office or his or her intent").

■ Postles and Smith argue that this case is indistinguishable from *Bogan* and that their roles in enacting the School District's administrative reorganization plan were akin to those of the city councilman and mayor, respectively. The Court agrees. Under Delaware law, the School Board is vested with authority "to determine and adopt rules and regulations for the general administration and supervision" of the public schools in the District. 14 Del.C. § 1043. The Board also has authority to appoint personnel and to "[d]etermine the educational policies . . . and prescribe rules and regulations for the conduct and management of the schools." *Id.* § 1049(2), (9).

Pursuant to its authority under Delaware law, the Board decided to eliminate the position of Supervisor of Transportation/Visiting Teacher from its administrative structure. As in *Bogan,* the Board's decision "involved the termination of a position, which, unlike the hiring or firing of a particular employee, may have prospective implications that reach well beyond the particular occupant of the office." *Bogan,* 523 U.S. at 56, 118 S.Ct. 966. In addition, the Board's decision implicated "the budgetary priorities of the [School District] and the services the [District] provides to its constituents." *Id.* at 55–56, 118 S.Ct. 966. Specifically, because the Supervisor of Transportation position was a part-time position for which the School District itself provided 44% of the funding from its visiting-teachers budget, *see* A–312, by eliminating that position, the School District freed up money with which it "could hire a full time licensed Social Worker for the position of Visiting Teacher with expanded responsibilities and services to the students and parents of the District." *Id.* Given such facts, the Court has little trouble concluding that the Board's adoption of the administrative reorganization plan was substantively legislative.

In addition, the actions of Smith and Postles were clearly procedurally legislative. As for Postles, who voted in favor of the reorganization plan, his act was, "in form, quintessentially legislative." *Bogan,* 523 U.S. at 55, 118 S.Ct. 966. Smith, on the other hand, who serves as Superintendent of the School District and Executive Secretary of the Board, is an executive official. Nevertheless, like the mayor in *Bogan,* Smith's actions also were "formally legislative." *Id.* The Board delegated to Smith the authority to develop a reorgani-

---

**6.** Although the Supreme Court did not decide whether a municipal action must be both procedurally *and* substantively legislative, the Third Circuit has so held. *See, e.g., Acierno v. Cloutier,* 40 F.3d 597, 610 (3d Cir.1994) ("We have established a two-part test to determine whether actions are to be regarded as legislative for immunity purposes: (1) the action must be 'substantively' legislative, which requires that it involve a policy-making or line-drawing decision; and (2) the action must be 'procedurally' legislative, which requires that it be undertaken through established legislative procedures.") (*citing Ryan v. Burlington County,* 889 F.2d 1286, 1290–91 (3d Cir. 1989)).

zation plan. *See* A–228; *see also* A–225 (Milford School District Policy Statement) ("[T]he Superintendent shall be responsible for the development and implementation of the line and staff organization chart."). Pursuant to that mandate, Smith designed a plan and formally proposed it to the Board, which adopted it in June, 1998. Given the Board's delegation of power to Smith and his subsequent role in designing and proposing the reorganization plan, Smith's actions were taken "in the sphere of legitimate legislative activity" and, therefore, he is entitled to absolute immunity. *Bogan*, 523 U.S. at 54, 118 S.Ct. 966 (*quoting Tenney v. Brandhove*, 341 U.S. 367, 376, 71 S.Ct. 783, 95 L.Ed. 1019 (1951)).

In conclusion, both Postles and Smith, as participants in the legislative process that led to the adoption of the administrative reorganization plan, are entitled to absolute immunity from McHugh's § 1983 claims. However, those claims may proceed against the Board. *See Carver v. Foerster*, 102 F.3d 96, 103 (3d Cir.1996) (holding that municipalities are not entitled to legislative immunity from § 1983 claims); *see also Monell v. Dept. of Social Servs.*, 436 U.S. 658, 701, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (rejecting municipality's argument that it was entitled to absolute immunity "lest our decision that such bodies are subject to suit under § 1983 be drained of meaning") (internal quotation omitted).

**B. First Amendment Claim**

An analysis of the School Board's liability must necessarily start with the Supreme Court's decision in *Monell*, where the Court overruled a portion of *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), and held that municipalities are "persons" under § 1983. *See* 436 U.S. at 690, 98 S.Ct. 2018. As for the scope of a municipality's liability, the Court held that "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694, 98 S.Ct. 2018. The Court described a municipal policy as a "statement, ordinance, regulation, or decision officially adopted and promulgated by [a local governing] body's officers." *Id.* at 690, 98 S.Ct. 2018. At the same time, the Court has "consistently refused to hold municipalities liable under a theory of respondeat superior" and, therefore, courts must apply "rigorous standards of culpability and causation ... to ensure that the municipality is not held liable solely for the actions of its employee." *Board of the County Comm'rs v. Brown*, 520 U.S. 397, 403, 405, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

McHugh has alleged the School Board violated his rights under the First Amendment by deciding to eliminate his position and not to renew his employment contract in retaliation for his statements regarding the Bowmans and their bus company. In order to recover, McHugh must demonstrate, first, that his statements were protected by the First Amendment. *See Azzaro v. County of Allegheny*, 110 F.3d 968, 975 (3d Cir.1997) (en banc). If so, McHugh then must show that his statements were a substantial or motivating factor in the Board's decision not to renew his contract. *See id.; see also Swineford v. Snyder County*, 15 F.3d 1258, 1270 (3d Cir.1994). If McHugh meets those burdens, the School Board can, nevertheless, prevail if it can demonstrate that it "would have taken the same action absent the protected [statements]." *Swineford*, 15 F.3d at 1270.

**1. Were McHugh's Statements Protected?**

■ Whether McHugh's statements regarding the Bowmans and the busing situation in the Milford School District were protected by the First Amendment is a question of law. *See Azzaro*, 110 F.3d at

975. In *Azzaro*, the Third Circuit Appellate Court recognized:

> [T]he [Supreme] Court [has] held that a public employee's expressive conduct is constitutionally protected only when two conditions are satisfied. First, the employee's conduct must address a "matter of public concern," which is to be determined by the "content, form, and context of a given statement, as revealed by the whole record." [*Connick v. Myers*, 461 U.S. 138, 147–48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).] Second, the value of that expression must outweigh "the government's interest in the effective and efficient fulfillment of its responsibilities to the public." *Id.* at 150, 103 S.Ct. 1684.... A discharged public employee is entitled to no redress if her expression is not related to a matter of public concern or, even if it is so related, if its value is outweighed by the value of permitting the government to take action promoting efficiency and effectiveness.

*Id.* at 976.

Applying those standards to the facts of this case, the Court holds that McHugh's statements were protected by the First Amendment. First, McHugh's statements addressed three primary issues: the safety of the bus driving services provided by the Bowman Busing Company, the alleged misconduct of Smith and Postles in failing to discipline the Bowmans, and the distribution of bus routes among contractors.

Defendants suggest that McHugh's statements were motivated by personal interest, as opposed to public concern, and, therefore, that they are not protected.[7] The Third Circuit Court of Appeals has clearly held, however, that "the speaker's motive, while often a relevant part of the context of the speech, is not dispositive in determining whether a particular statement relates to a matter of public concern." *Azzaro*, 110 F.3d at 978; *see also Swineford*, 15 F.3d at 1272. Here, McHugh's statements were addressed to issues of student safety, public officials' alleged malfeasance, and School Board policies, all of which are clearly matters of public concern. *See Pickering v. Board of Educ.*, 391 U.S. 563, 566, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (school teacher's letter criticizing the Board of Education's proposals for school financing addressed to a matter of public concern); *Lee v. Nicholl*, 197 F.3d 1291, 1296 (10th Cir.1999) (holding that a memo relating to traffic safety and snow removal at a particular intersection was a matter of public concern); *Swineford*, 15 F.3d at 1271 ("speech disclosing public officials' misfeasance is protected"); *Reidenbach v. U.S.D. No. 437*, 912 F.Supp. 1445, 1450 (D.Kan.1996) ("There is no dispute that the safety of school children is a matter of significant public concern.... Plaintiff's statements that overcrowding on her bus may cause safety problems are of obvious interest to members of the community, and particu-

---

7. The School District would have the Court draw the inference that, due to their timing, McHugh's statements were not of public concern but "were an attempt to divert attention away from his poor [job] performance." D.I. 42 (Defendants' Opening Brief), at 19. However, the record evidence, viewed in the light most favorable to McHugh, does not support such an inference. The evidence regarding McHugh's job performance is as follows: Independent of his investigations of the Bowmans, McHugh was responsible for the administration of the School District's busing system. By early August, 1997, Smith had received numerous complaints from both parents and private contractors regarding errors in the District's bus schedules. *See* A–52, A–120, A–122, A–261–262. As a result, Smith sent McHugh a memorandum in which he indicated that "[t]he quality of [your] work that I see here is simply unacceptable." A–120. But there is also evidence suggesting that plaintiff's performance was not deficient. *See* B–123 (affidavit of Daniel McGinniss) (indicating that "I had no concerns [in 1996] significant enough to warrant anything other than a good performance"). Indeed, by July, 1998, when the Board voted to eliminate McHugh's position, his performance appears to have improved, because he was given a "satisfactory" evaluation by Dan McGinniss. B–46. Given the conflicting evidence, there is an issue of fact as to McHugh's performance.

larly to parents of the defendant school district.") (internal citations omitted). In short, McHugh's statements all involve "matter[s] of interest to the community upon which it is essential that public employees be able to speak out freely without fear of retaliatory dismissal." [8] *Connick,* 461 U.S. at 149, 103 S.Ct. 1684.

Second, the value of McHugh's speech, as measured by McHugh's and the public's interest, is not outweighed by the School Board's interest in effective and efficient provision of services. *See Azzaro,* 110 F.3d at 980. Given that McHugh's statements go to the safety of school children, the conduct of School Board officials, and the District's budgetary policies relating to school-bus route distribution, the public interest in McHugh's statements is substantial. Furthermore, there is nothing in the record to suggest that School Board's interest in efficiency or effectiveness were in any way compromised by virtue of McHugh's statements. Accordingly, the balance of the competing interests falls in McHugh's favor.

### 2. Retaliatory Motive

■ That McHugh's statements were protected by the First Amendment merely begins the Court's inquiry. Next, McHugh must demonstrate that there is a material issue of fact as to whether his statements were a substantial or motivating factor in the Board's decision to eliminate his position and not renew his contract. Of course, the reorganization plan enacted by the School Board is, on its face, benign—*i.e.,* there is no indication in the text of the plan that it was adopted as a result of and in retaliation for McHugh's statements. "In cases like this one, implicating the exercise of First Amendment rights, liability under section 1983 can attach to the passage of a facially benign law only if one peers beneath the textual facade and concludes that the legislative body acted out of a constitutionally impermissible motive." *Scott–Harris v. City of Fall River,* 134 F.3d 427, 436 (1st Cir. 1997), *rev'd on other grounds,* 523 U.S. 44, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998).[9] Attributing a particular motive to an entity such as a School Board is no easy task, and courts have universally allowed plaintiffs to prove that the individual legislators acted with impermissible motives by either direct or circumstantial evidence. *See id.; United States v. City of Birmingham,* 727 F.2d 560, 564–65 (6th Cir.1984); *Smith v. Town of Clarkton,* 682 F.2d 1055, 1064–65 (4th Cir.1982); *see also Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) ("Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."). But that speaks only to the qualitative nature of the proof; it does not answer the more difficult, quantitative question—*i.e.,* how many Board members must be animated by a constitutionally impermissible motive in order for liability under section 1983 to attach to the Board as an entity?

The inquiry as to the Board's liability is fact intensive. The record viewed in the light most favorable to McHugh leads to the conclusion that Smith acted on an impermissible motive in proposing the elimination of McHugh's position and that Pos-

---

8. In their Reply Brief, defendants argue that, because there is no "evidence that [McHugh's statements] were ever addressed to anyone outside the District or in any public form[,] ... his speech was not a matter of public concern." D.I. 46, at 9. The Third Circuit has clearly rejected that argument, however. *See Azzaro,* 110 F.3d at 978 ("[I]f the content and circumstances of a private communication are such that the message conveyed would be relevant to the process of self-governance if disseminated to the community, that communication is public concern speech even though it occurred in a private context."); *see also id.* ("Private dissemination of information and ideas can be as important to effective self-governance as public speeches.").

9. The Supreme Court reversed on the legislative immunity ground. *See Bogan v. Scott–Harris, supra.*

tles acted on an impermissible motive in voting to approve Smith's proposal. With respect to Smith, the most damning piece of evidence is a memorandum he wrote to the Board in response to McHugh's charges of official misconduct. *See* B–31. The memorandum was written about six months before Smith made his proposal to the Board, and it contains inflammatory language regarding McHugh. *See, e.g.,* B–34 ("Mr. McHugh's charges are not substantiated by any facts. They are an attempt to deflect attention away from his poor performance and his disparate treatment of some contractors."); *id.* ("Mr. McHugh's charges malign and defame the Board President [Postles] and the Superintendent [Smith]."); *id.* ("[McHugh's] statements and actions represent blatant disloyalty and disrespect for my position of authority as District Superintendent. His use of his office to make false and unsubstantiated allegations against the Superintendent and Board President and his disparate treatment of a select group of bus contractors represents misconduct in office.").

As for Postles, the evidence also is such that a reasonable jury could find that he was animated by a retaliatory motive. In the summer of 1996, Postles "raised his voice, acted belligerent [sic] toward Mr. McHugh, made demands of Mr. McHugh, and asked repeated questions regarding the operation of the transportation department." B–117–118 (Affidavit of Larry Warner). A year later, McHugh brought charges of official misconduct against Postles. Postles responded in a letter to David Williams, the attorney hired by the Board to investigate the allegations, "[s]crutiny of these charges reveals that they are reckless, false and malicious." B–35. As for the Board itself, it is clear that the Board had knowledge both of McHugh's reports about the Bowmans and of McHugh's charges of misconduct against Postles and Smith. *See* A–133–149. In addition, in April, 1995, the one time that McHugh was permitted to address the Board regarding his complaints

about the Bowmans, McHugh "did little more than introduce himself and the topic for discussion before being interrupted . . . and asked to leave. . . ." B–124 (Affidavit of Daniel McGinniss). Third, although the Board knew that McHugh had just recently filed charges of official misconduct against Smith, there is no evidence suggesting that the Board did anything other than "rubber stamp" Smith's proposed reorganization plan which eliminated (only) McHugh's position. *See* A–195 (minutes from the July 13, 1998, Board meeting). Finally, it is clear that the School Board has not yet implemented its reorganization plan, and McHugh has produced some evidence suggesting that the School Board does not plan to do so. It is true that the School Board has explained its failure to implement the plan, but at this point, the Court is not at liberty to weigh the evidence. *See Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 286 (3d Cir.2000) ("On summary judgment, . . . [the court's] role is not to act as factfinder.").

Given the above facts, the outcome is controlled by the analysis of the Third Circuit *en banc* decision in *Azzaro v. County of Allegheny, supra. Azzaro* directly addresses the situation here—*i.e.,* a municipal official makes a facially-benign policy proposal to a legislative body, which then adopts the proposal with little or no discussion. In *Azzaro,* the plaintiff produced evidence from which a reasonable jury could infer that the official making the proposal and one voting member of the Board were animated by a constitutionally impermissible motive. *See* 110 F.3d at 973–74. In such a case, if the plaintiff can produce additional evidence which suggests the Board's complicity (there, that it rubber stamped the proposal and had never terminated an employee in the way it terminated Azzaro), a defendant's motion for summary judgment must be denied. *See id.* at 974–75. In a significant passage, the Court held:

It is true, as defendants point out, that these individuals could not implement

the reorganization plan themselves. To discharge Azzaro in this manner, it was necessary to obtain the approval of the Salary Board. While there is *no evidence* that a majority of the Board's voting members had actual knowledge of Azzaro's reports when they approved the reorganization, this does not preclude Azzaro from recovering on her Title VII retaliation claim. *See generally Bartholomew v. Fischl,* 782 F.2d 1148, 1153 (3d Cir.1986) (holding that plaintiff may state claim of constitutional deprivation against city by alleging that mayor, who was powerless to discharge plaintiff, persuaded city council to eliminate plaintiff's position). To hold otherwise would be to grant public officials carte blanche to retaliate against employees as long as the retaliation is formally effectuated by the "rubber stamp" approval of another public agent.... [10]

*Id.* at 974 (emphasis added); [11] *see also Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1459 (7th Cir.1994) ("[s]ummary judgment generally is improper where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action").

Viewing McHugh's facts in their most hospitable light, the Court finds there is a remarkable congruence with the facts of *Azzaro.* There is evidence that Smith, who introduced the reorganization plan, and Postles, the then-President of the School Board who voted in favor of it, harbored constitutionally impermissible motives. In addition, McHugh has introduced some evidence of the Board's complicity—*e.g.,* that it abruptly dismissed McHugh the one time he appeared before the Board; that it was aware of McHugh's

charges of misconduct against Smith and Postles; that it rubber stamped Smith's proposal; and that it has thus far failed to implement the reorganization plan. Based on *Azzaro,* there exists a material issue of fact as to whether McHugh's complaints about the Bowmans and his allegations of misconduct against Smith and Postles were a motivating factor in the Board's decision to eliminate his position and not to renew his contract. For the same reasons, there is also a material issue of fact as to whether the Board would have taken the same action absent McHugh's protected statements. Accordingly, the defendants' motion for summary judgment on this claim will be denied.

## C. Fourteenth Amendment Claim

McHugh does not assert a property interest in his continued employment with the School District. Rather, he maintains the Board's decision to eliminate his position deprived him of a protected liberty interest. The Supreme Court has recognized that the concept of liberty embodied in the Due Process Clause "denotes not merely freedom from bodily restraint but also the right of the individual to contract [and] to engage in any form of the common occupations of life...." *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 572, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Indeed, "[t]here might be cases in which a State refused to re-employ a person under such circumstances that interests in liberty would be implicated." *Id.* at 573, 92 S.Ct. 2701. McHugh asserts this is such a case.

█ Although it did not resolve all of the thorny legal issues surrounding the issue, the Third Circuit Court of Appeals

---

**10.** The *en banc* court also found that "a reasonable juror could conclude that it is a routine matter for the Salary Board to approve, with little or no discussion, proposals which purport to save the County money." *Id.* at 974.

**11.** Although the quoted passage relates to Azzaro's Title VII claim, the Third Circuit Appel-

late Court applied the same reasoning to Azzaro's First Amendment claim. *See id.* at 981 ("Based on the evidence we have reviewed in the context of Azzaro's Title VII claim, we also conclude that there is a material dispute of fact as to whether her reports [of sexual harassment] were a motivating factor in the discharge decision.").

recently considered the scope of a person's protectible liberty interest in his or her reputation in *Ersek v. Township of Springfield*, 102 F.3d 79 (3d Cir.1996). *Ersek* involved a former golf professional at a publicly-owned golf course who alleged that the township's public statements about him harmed him to such an extent that they infringed on his liberty interest in his reputation. Germaine to this case is the principle that: "For government action to infringe the 'reputation, honor, or integrity' of an individual, that government action . . . must involve a publication that is substantially and materially false." *Id.* at 83–84. It is the publication requirement that is of concern here. *See also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 547 n. 13, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) ("failure to allege that the reasons for the dismissal were published dooms" plaintiff's liberty-interest claim); *Bishop v. Wood*, 426 U.S. 341, 348, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) ("Since the . . . communication was not made public, it cannot properly form the basis for a claim that petitioner's interest in his 'good name, reputation, honor, or integrity' . . . was thereby impaired.") (footnote omitted); *Donato v. Plainview–Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 631 (2d Cir.1996) ("Stigmatizing statements by the government about an employee upon her discharge only implicate a liberty interest when there is also public disclosure."); *Six v. Henry*, 42 F.3d 582, 585 (10th Cir.1994) ("for a successful liberty deprivation claim, an employee . . . must show that her dismissal resulted in the *publication* of *information* which was *false* and *stigmatizing*") (emphasis in original) (internal quotation omitted).

■ The focus of McHugh's complaint are statements that Smith made to the Board regarding McHugh's performance which McHugh asserts were false and caused his contract not to be renewed. *See* B–31 (Smith's Memorandum to Board). As McHugh all but conceded at oral argument, however, there is no evidence in the record which shows that any of Smith's statements were made public. *See* D.I. 55, at 60–61. Smith's letter to McHugh informing him of the Board's decision cites only the administrative reorganization plan as the reason for his dismissal. *See* A–207. Moreover, McHugh admits that, to the extent the public was told anything about his dismissal, it was that his contract was not renewed as a result of the reorganization plan. *See* A–47 (McHugh deposition). Because no statement by Smith or the Board regarding McHugh's performance was ever made public, McHugh's claim that his liberty interest in his reputation was infringed by those statements must fail.

In addition to the statements by Smith, McHugh also alleges that a statement by Postles implicates his liberty interest in his reputation. *See* B–116 (Affidavit of William Mills). William Mills, a temporary substitute bus driver for the School District, averred that "while at the tailor shop owned by the family of Defendant Charles Postles, Mr. Charles Postles and [he] engaged in a conversation wherein Mr. Postles stated that Mr. Don McHugh and Ms. Terry Rogers fouled-up the State transportation coding for Milford School District Buses." *Id.* Even assuming that Postles's statement was false, there is no evidence that McHugh's reputation has suffered as a result. *See Ersek*, 102 F.3d at 83 n. 5 ("It is clear that to make out a claim for a violation of a liberty interest in reputation a plaintiff must show a stigma to his reputation. . . ."); *see also Board of Regents of State Colleges v. Roth*, 408 U.S. at 573, 92 S.Ct. 2701 (recognizing that a decision by a public entity not to re-employ a person may implicate a liberty interest if, in declining to rehire a person, the State either (1) makes a charge against him that "might seriously damage his standing and associations in his community" or (2) "impose[s] on him a stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities").

At oral argument, counsel for the McHugh was asked whether there is "any evidence in the record that Mr. McHugh's standing and association in the community was damaged by the Board's decision not to renew his contract," and counsel responded "I don't believe so. . . ." D.I. 55, at 61. Indeed, the only evidence relating to McHugh's standing in the community is a petition, signed by dozens of parents of District school children and by other bus drivers and contractors, that was forwarded to the School Board in support of his continued employment as the Supervisor of Transportation. *See* A–231; C–13–63. Finally, while McHugh has unsuccessfully sought re-employment with the Milford School District as the Director of Operations, there is no indication that the Board's decision not to rehire him has adversely impacted his ability to secure other present or future employment. Accordingly, the defendants are entitled to summary judgment on McHugh's claim that the allegedly false statement made by Postles stigmatized him.

\*　　\*　　\*　　\*　　\*　　\*

In summary, the Court will grant defendants' motion for summary judgment on McHugh's claim that the School Board's decision to eliminate his position and not renew his contract violated his Fourteenth Amendment rights.

### D. State Law Claims

#### 1. Breach of the Implied Covenant of Good Faith and Fair Dealing

■ Count 2 of McHugh's complaint alleges the School Board breached the implied covenant of good faith and fair dealing by voting to eliminate his position and not renew his contract. The essence of McHugh's claim is that the Board manufactured the budgetary reasons for not renewing his contract in an effort to conceal their true intention of retaliating against him for his statements regarding the Bowmans and the asserted misconduct of Smith and Postles.

In *Merrill v. Crothall–American, Inc.,* 606 A.2d 96, 101 (Del.1992), the Delaware Supreme Court held "that every employment contract made under the laws of this State, consonant with general principles of contract law, includes an implied covenant of good faith and faith dealing." In *Merrill,* essentially a case regarding fraud in the inducement of an at-will employment contract, the court held that an employer acts in bad faith "when it induces another to enter into an employment contract through actions, words, or the withholding of information, which is intentionally deceptive in some way material to the contract." 606 A.2d at 101. The Delaware Supreme Court also had stated that the doctrine of breach of the covenant of good faith and fair dealing may "relate[ ] . . . to an act or acts of the employer manifesting . . . deceit or misrepresentation in falsifying or manipulating a record to create fictitious grounds to terminate employment." *E.I. DuPont de Nemours & Co. v. Pressman,* 679 A.2d 436, 443–444 (Del. 1996). In *Pressman,* the court held that, if the "creation of false grounds and manufacturing a record in order to establish a fictitious basis for termination" of the plaintiff's employment was done intentionally, this would amount to a breach of the covenant of good faith and fair dealing. *Id.* at 444.

■ Based on the analysis of McHugh's First–Amendment retaliation claim, *supra,* there exists a material issue of fact as to whether the School Board's budgetary rationale for eliminating McHugh's position was a fictitious, manufactured rationale for not renewing his contract. Accordingly, McHugh's claim may proceed against the School Board.[12]

---

12. The implied covenant of good faith and fair dealing attaches to an employment contract. *See Merrill,* 606 A.2d at 101. It follows a cause of action for breach of the covenant presupposes the existence of a contract. McHugh was not discharged; he served out his final two-year contract, which expired on June 30, 1999. It is unclear from the plead-

## 2. Tortious Interference with Contract

Defendants contend that McHugh has failed to state a cause of action for interference with contract because there is no evidence that his contract was breached. *See* D.I. 42, at 24 (citing *Irwin & Leighton, Inc. v. W.M. Anderson Co.,* 532 A.2d 983, 992 (Del.Ch. 1987); *Nelson v. Fleet Nat'l Bank,* 949 F.Supp. 254 (D.Del.1996)).[13] However, McHugh's allegation is that Smith and Postles intentionally and improperly induced the Board not to renew his contract, thereby tortiously interfering with McHugh's *"prospective* contractual relation" with the Board.[14] D.I. 1, ¶ 51 (emphasis added). Although the Supreme Court of Delaware has not yet opined on the tort of intentional interference with prospective contractual relations, the "Delaware courts have long recognized the persuasiveness of the Restatement of Torts in the area of contractual interference." *American Original Corp. v. Legend, Inc.,* 652 F.Supp. 962, 969 (D.Del. 1986) (citing *Bowl–Mor Co., Inc. v. Bruns-wick Corp.,* 297 A.2d 61, 64 (Del.Ch.1972); *Regal Home Distributors v. Gordon,* 66 A.2d 754 (Del.Super.1949)); *see also, e.g., Shearin v. E.F. Hutton Group, Inc.,* 652 A.2d 578, 589–90 (Del.Ch.1994); *Hursey Porter & Assocs. v. Bounds,* Civ. A. No. 93C–01–091, 1994 WL 762670, at *13–14 (Del.Super. Dec.2, 1994). The relevant provision of the Restatement provides:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
>
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
>
> (b) preventing the other from acquiring or continuing the prospective relation.

Restatement (Second) of Torts § 766B (1979). McHugh's claim would fall under prong (a). To state a claim for tortious interference with a prospective contractual

---

ings whether the claim here is for breach of the implied covenant of good faith and fair dealing relating to McHugh's existing contract or, rather, relating to the prospective contract that was never formed because the Board, allegedly for improper reasons, failed to renew a contract with McHugh after voting to eliminate the position he held. There does not appear to have been a breach of the former contract, and no new employment contract, either at-will or for a specified duration, was formed between McHugh and the School Board subsequent to the termination of his final two-year contract with the School District. Thus, the Court has serious reservations as to whether the Delaware Supreme Court would recognize a cause of action for breach of the implied covenant of good faith and fair dealing with respect to a prospective contract that never came into existence. *See Lord v. Souder,* 748 A.2d 393, 401 (Del.2000) ("[I]mplying obligations based on the covenant of good faith and fair dealing is a cautious enterprise." (internal quotation marks and citation omitted)). However, because the parties did not raise or brief this issue, the Court will not at this stage make a determination as to whether McHugh can state a cause of action for breach of the implied covenant of good faith and fair dealing where the gravamen of the complaint is failure to extend or renew a contract.

13. The elements of a claim for tortious interference with an *existing* contractual relation are "(1) a contract, (2) about which defendant[s] knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification [and] (5) which causes injury." *Irwin & Leighton, Inc.,* 532 A.2d at 992.

14. McHugh's complaint asserts the claim for intentional interference with contractual relations against William Bowman, James Bowman, the Bowman Bus Service, Inc., Dr. Smith, Mr. Postles, and "members of the Bd. of Ed." D.I. 1, ¶¶ 51–52. Defendants' brief in support of the summary judgment motion does not distinguish among the different defendants when discussing the state claims. However, as indicated *supra,* note 1, the Bowmans are no longer parties to this action. Other than Postles, no other individual members of the Board have been named as defendants in this suit. Therefore, the Court's discussion of this claim is limited to Smith and Postles.

relationship, McHugh must demonstrate that Smith's and Postles' actions were intentional and improper.[15] *See id.* Courts consider the factors set forth in § 767 of the Restatement, including the actor's motive and conduct, in determining whether interference with existing or prospective contractual relations is improper. *See, e.g., American Original Corp.,* 652 F.Supp. at 970; *Irwin & Leighton, Inc.,* 532 A.2d at 992–93 (quoting Restatement (Second) of Torts § 767); Restatement (Second) of Torts § 766B, cmt. d. Based on the evidence discussed in the course of the First Amendment analysis, *see supra* section III.B., a reasonable jury could find that Smith and Postles intentionally and improperly interfered with McHugh's prospective contractual relationship with the School Board.

Defendants Smith and Postles next assert that they are immune from an action for tortious interference with contract because they were acting within the scope of their employment. *See Shearin,* 652 A.2d at 589. However, "[w]hether an employee has acted beyond the scope of employment is generally a question for the jury...." *Nelson,* 949 F.Supp. at 263. Because the Court has already held that a reasonable jury could find that Smith proposed—and Postles voted for—the reorganization plan in retaliation for McHugh's First Amendment activity, the Court finds that, viewing McHugh's evidence in its most favorable light, a reasonable jury could likewise find that Smith and Postles were acting outside the scope of their employment. *See Donson v. Baez,* No. 89–365–CMW, 1991 WL 26995, at *3 (D.Del. Feb.21, 1991) (employ-ees' acts not within the scope of employment when they were personally motivated, as opposed to motivated by a desire to serve their employer). Accordingly, defendants' motion for summary judgment on this claim will be denied.

### 3. "Whistleblower" Statute

 McHugh's third state claim is based on Title 29, Section 5115(b) of the Delaware Code, which provides as follows:

> No public employee shall be discharged, threatened or otherwise discriminated against with respect to the terms or conditions of employment because that public employee reported, in a written or oral communication to an elected official, a violation or a suspected violation of a law or regulation promulgated under the law of the United States, this State, its school districts, or a county or municipality of this State unless the employee knows that the report is false.

29 Del.C. § 5115(b). McHugh alleges the Board retaliated against him for his reporting suspected violations of the law and other issues of public concern related to the allegations of misconduct against the Bowmans, Postles, and Smith.

Defendants argue that McHugh has failed to demonstrate a change in the terms or conditions of his employment. In his brief, McHugh curtly replies: "Plaintiff is no longer employed by the ... Board of Education of the Milford School District. What other change could the legislature have had in mind?" D.I. 44 (Plaintiff's Answer Brief), at 27. The Court agrees with McHugh. Defendants cannot avoid

---

15. Delaware courts other than the Supreme Court have set forth the following elements that must be proved in a claim for tortious interference with prospective contractual relations:
 (1) the existence of a valid business relationship or expectancy;
 (2) knowledge of the relationship or expectancy on the part of the interferer;
 (3) intentional interference which induces or causes a breach or termination of the relationship or expectancy; and
 (4) resulting damages to the party whose relationship or expectancy has been disrupted.
 *Lucent Info. Management, Inc. v. Lucent Techs., Inc.,* 5 F.Supp.2d 238, 243 (D.Del. 1998) (quoting *Dionisi v. DeCampli,* 1995 WL 398536 (Del.Ch. June 28, 1995)). *See also, e.g., Rypac Packaging Machinery Inc. v. Coakley,* No. Civ. A. 16069, 2000 WL 567895, at *10 (Del.Ch. May 1, 2000); *In re Frederick's of Hollywood, Inc.,* 24 Del.J.Corp.L. 237, 1998 WL 398244, *5 (Del.Ch. July 9, 1998);

the prohibitions of § 5115(b) by characterizing their action as a decision not to renew an employment contract, as opposed to a decision to terminate an employment contract. Section 5115(b) prohibits not only retaliatory discharge but also broadly prohibits "otherwise discriminat[ing] . . . with respect to the terms or conditions of employment." [16] Clearly, there has been a change in McHugh's employment status with the School District and, because a reasonable jury could find that his allegations of misconduct against Smith and Postles, at least in part, led to the School Board's decision to eliminate his position and not renew his contract, defendants' motion for summary judgment on this claim must be denied. [17]

### 4. Wrongful Discharge in Violation of Public Policy

■ Finally, McHugh asserts a claim against the Board for wrongful discharge "pursuant to the public policy exception to the employment at will doctrine." D.I. 1, ¶ 62. [18] As an initial matter the Court notes that there is no Delaware decisional authority regarding whether the public policy exception to the employment at-will

doctrine encompasses a case such as this where there is no at-will employment relationship and no discharge per se, but instead involves a decision not to renew a contract. The Court need not attempt to predict how the Delaware Supreme Court would decide this issue, [19] however, because the Court finds that McHugh cannot maintain a cause of action on this claim for other reasons.

"The public policy exception, whether conceived of independently as a tort or as arising from the [implied covenant of good faith and fair dealing], [20] generally requires a clear mandate of public policy." *Pressman*, 679 A.2d at 441.

> Employees who seek protection from firing on the basis that their actions were protected by a public policy, must assert a public interest recognized by some legislative, administrative or judicial authority, and the employee must occupy a position with responsibility for that particular interest.

*Id.* at 441–42 (quoting *Shearin v. E.F. Hutton Group, Inc.*, 652 A.2d at 587–88). In *Pressman*, the plaintiff asserted a claim for wrongful discharge in violation of pub-

---

**16.** There also is a disputed issue of fact as to whether Smith threatened McHugh that his contract would not be renewed if McHugh brought charges of misconduct against Smith and Postles. *See* D.I. 43, at A–127.

**17.** It is unclear from the pleadings and the briefs precisely what "violation or [ ] suspected violation of a law or regulation" McHugh allegedly reported to various officials. Although the safety of children on school buses, School District officials' methods for handling complaints, and distribution of bus contracts are all matters of public concern, it is not clear that any of the issues McHugh has raised involve violations of law or regulations. Although the Court has concerns as to whether McHugh can state a cause of action under 29 Del.C. § 5115(b), because defendants have not raised the issue, it will not be addressed.

**18.** The Board asserts that to establish a claim for wrongful discharge, McHugh must show a protectible liberty or property interest in his employment. *See* D.I. 42, at 23 (citing *Dutton v. Watson, et al.*, C.A. No. 92C–12–210–1–CV,

1994 WL 164486, *2 (Del.Super. Apr.28, 1994), *aff'd Dutton v. Risley*, No. 190, 1994, 1994 WL 658488, at *1 (Del. Nov.15, 1994)). The Court finds *Dutton* inapposite as it did not involve a claim of wrongful discharge in violation of public policy, but rather appears to have involved a claim for wrongful discharge in violation of due process rights, which, as discussed *supra*, section III.C., requires a protected liberty or property interest.

**19.** Where there is no settled state law regarding a particular dispute, this Court must predict how the Supreme Court of Delaware would resolve the issue. *See Scotts African Union Methodist Protestant Church v. Conference of African Union First Colonial Methodist Protestant Church*, 98 F.3d 78, 92 (3d Cir. 1996), *cert. denied*, 519 U.S. 1058, 117 S.Ct. 688, 136 L.Ed.2d 612 (1997).

**20.** In a subsequent case, the Supreme Court of Delaware more clearly appears to view the public policy exception as a subset of the implied covenant of good faith and fair dealing. *See Lord v. Souder*, 748 A.2d at 400.

lic policy based on his assertion that he was fired in retaliation for questioning the propriety of his supervisor's business practices. The court held these facts "[did] not rise to the level of a legally cognizable public policy exception." *Id.* at 442. The court implied the results would have been different had the employee complained internally about illegal activity. *See id.* ("Employees who uncover and blow the whistle on questionable internal financial and business practices [absent illegality] have won no support from the courts." (quoting Holloway & Leech, Employment Termination: Rights and Remedies at 180 (2d ed.1993))); *see also Paolella v. Browning–Ferris, Inc.,* 973 F.Supp. 508, 512 (E.D.Pa.1997) (concluding, based on the language of *Pressman,* that the Supreme Court of Delaware would extend the public policy exception to an employee who was terminated for making internal reports of criminal conduct), *aff'd* 158 F.3d 183 (3d Cir.1998). Here, McHugh has not identified "any legislative, administrative or judicial authority" establishing a recognized public interest. Although the concerns raised by McHugh regarding student safety on buses and the allocation of bus contracts are issues of public concern, they do not appear to be concerns regarding illegal activity; rather, they appear to be concerns about the propriety of internal management practices. If that is the case, the Court concludes that, extending the logic of *Pressman,* the Supreme Court of Delaware would conclude that the facts of this case would not to give rise to a legally cognizable public policy exception.

 Moreover, in the alternative, even if McHugh's statements regarding the Bowmans, Smith, and Postles were in fact complaints regarding suspected violation(s) of law or regulations articulated by legislative, administrative, or judicial authority, retaliatory action for reporting such suspected violations is prohibited by the whistle blower statute, 29 Del.C. § 5115(b). The Delaware Supreme Court has made only limited, careful incursions on the employment at-will doctrine. *See, e.g., Lord,*

748 A.2d at 400–01. As it has opined in the past, this Court does not believe the Delaware Supreme Court would create a public policy exception for wrongful discharge for claims for which a statutory remedy already exists under state law. *See Williams v. Caruso,* 966 F.Supp. 287, 292 (D.Del.1997); *Finch v. Hercules, Inc.,* 809 F.Supp. 309, 312 (D.Del.1992). The logic of *Williams* and *Finch* extends to the case at bar.

For the foregoing reasons, the Court finds that McHugh has not stated a claim for wrongful discharge in violation of the public policy exception to the employment at-will doctrine.

## IV. Conclusion

The defendants' motion for summary judgment will be granted in part and denied in part. Specifically, defendants' motion for summary judgment will be granted with respect to McHugh's Fourteenth Amendment and wrongful discharge claims. As for the First Amendment claim, Smith and Postles are entitled to summary judgment, but the Board is not. With respect to the remaining claims, defendants' motion for summary judgment will be denied.